TOLEDO, A. A. & N. M. RY. CO. v. PENNSYLVANIA CO. et al.

(Circuit Court, N. D. Ohio, W. D.    March 25, 1893.)

No. 1,139.

1. FEDERAL COURTS—JURISDICTION—INTERSTATE COMMERCE ACT.

A suit in equity to enforce by injunction the third section of the interstate commerce act, and praying that certain railroad companies be restrained from refusing to afford equal facilities to the complainant, a connecting railroad, in the exchange of interstate traffic, involves a federal question which is sufficient to give a federal court jurisdiction of the whole cause, though remedies of a similar nature may exist under state statutes or the common law. Osborn v. Bank, 9 Wheat. 738, followed.

2. INJUNCTION—DENIAL OF EQUAL FACILITIES TO CONNECTING RAILROAD.

Where a labor organization has declared a boycott against a railroad, and connecting roads are therefore refusing, or seem about to refuse, to afford equal facilities to the boycotted road, in violation of section 3 of the interstate commerce act, they may be compelled to do so by mandatory injunction, since the case is urgent, the rights of the parties free from reasonable doubt, and the duty sought to be enforced is imposed by law. Coe v. Railroad Co., 3 Fed. Rep. 775, followed.

3. SAME—BINDING ON EMPLOYES.

A mandatory injunction restraining a railroad company from refusing equal facilities to a connecting line in violation of section 3 of the interstate commerce act, is binding upon all officers and employes of the respondent having proper notice thereof, whether they are made parties or not.

4. EQUITY—NEW REMEDIES.

A court of equity has power to contrive new remedies and issue unprecedented orders to enforce rights secured by federal legislation, provided no illegal burdens are imposed thereby. Joy v. St. Louis, 11 Sup. Ct. Rep. 243, 138 U. S. 1, followed.

5. MASTER AND SERVANT—RAILWAY EMPLOYES — IMPLIED OBLIGATIONS—QUITTING SERVICE.

Railway employes accept their places under the implied condition that they will not quit their employer's service under circumstances rendering such conduct a peril to the lives and property committed to its care, or in such a manner as to subject it to legal penalties or forfeitures; and although, in ordinary circumstances, the employer must rely upon his action at law for a breach of the condition, a court of equity has power to restrain employes from acts of violence and intimidation, and from enforcing rules of labor unions which result in irremediable injuries to their employers and the public, such as those requiring an arbitrary strike without cause, merely to enforce a boycott against a connecting line.

6. INJUNCTION AGAINST RAILWAY—VIOLATION BY EMPLOYE — CONTEMPT—EVIDENCE.

An engineer of a railroad company which has been enjoined from refusing to haul the cars of a boycotted connecting line, of which injunction he has notice although he has not been made a party thereto, and who, while on his run, refuses to attach such a car to his train, and declares that he quits his employment, but nevertheless remains with his engine at that point for five hours, until he receives a telegram from his labor union to haul the car, and who thereafter continues in his employment, is guilty of contempt for violating the injunction, although engineers who refuse to haul such cars in obedience to a rule of the labor union, and in good faith quit their employment before starting on their run, may not be in contempt.

In Equity.    Bill by the Toledo, Ann Arbor & North Michigan Railway Company against Albert G. Blair, Jacob S. Morris, the

Pennsylvania Company, the Lake Shore & Michigan Southern Railway Company, and others, to enjoin respondents from refusing to extend to complainant the same equal facilities as to others for the exchange of interstate traffic. The injunction was issued, served upon the Lake Shore & Michigan Southern Railway Company, and brought to the notice of its employes by publication. Heard on application by said company for an order attaching Clark, Case, Rutger, and Lennon, its employes, for contempt in violating the injunction. Granted as to Lennon.

Statement by RICKS, District Judge: '

The original bill was filed March 11, 1893, and the mandatory injunction set out in the opinion of the court was made on the same day. On the 18th of . March, upon an affidavit filed by the superintendent of the Michigan division of the Lake Shore & Michigan Southern Railroad, the material allegations of which are set forth in the opinion of the court, a rule was entered requiring certain named engineers and firemen, who were employed by that company, and in said affidavit charged with knowingly violating the orders of the court, to appear and show cause why they should not be attached for contempt. Pending the service of this order upon the accused, it was represented to the court by counsel and officials of the several defendant railroads that there was great excitement and anxiety among the employes of the railroads involved as to the duties expected from them under the mandatory orders made, and it was therefore suggested that some statement from the court as to the scope and purpose of said order would not only be very acceptable, but wholesome and beneficial, and might result in preventing the strike from spreading. Accordingly, when the accused were brought into court, and before they were released upon their own recognizance to appear from day to day, and abide the further orders of the court, the following admonition was given to them:

### "Admonition to the Accused.

"The order of the court was made in this case after due consideration, with full knowledge of its scope and possible consequences, and with the purpose to enforce it in its letter and spirit without unnecessary hardship, but with such promptness and vigor as might become necessary to give full protection to all concerned. You are now before the court under an order based upon affidavits to show cause why you should not be attached for contempt for refusing to obey the order of the court, a copy of which has been duly brought to your attention. The court proposes to give you full opportunity to employ counsel, take advice, and make all proper defenses. You are to have your day in court, and be fully heard. But I desire now, at this stage of the proceedings, to suggest to you that you should not overlook the nature and importance of your employment. You are engaged in a service of a public character, and the public are interested not only in the way in which you perform your duties while you continue in that service, but are quite as much interested in the time and circumstances under which you quit that employment. You cannot always choose your own time and place for terminating these relations. If you were permitted to do so, you might quit your work at a time and place, and under circumstances, which would involve irreparable damage to your employers, and jeopardize the lives of the traveling public. Your employers owe a high duty to the public, which they are compelled to perform under severe penalties for every neglect, and they have in turn a higher claim upon you and your service than that due from the ordinary employe. This court does not assume the power to compel you to continue your service to your employers against your will, but it does undertake to compel you to perform your whole duty while such relations continue; and does further claim, for the purpose of ascertaining whether its orders have been violated, the right to determine when your relations to your employer legally terminated, and when your obligations to observe this order

ceased. So that it may, in the mean time, be important for you to reflect and consider whether you can safely continue in your employer's service with the purpose to quit it at a moment when some duty may be required of you which is in violation of some supposed promise or obligation you owe, another, not your employer. That time for leaving your post of duty might come under circumstances when you would by such act unintentionally imperil the safety of lives intrusted to your employers, and do their business vast and irreparable damage. It might, too, unintentionally involve you in a conflict with the court through obstructing its process and interfering with its mandates. I therefore suggest to you, and to all others who are in similar employment, that there ought not to be any strained construction made of the provisions of the court's order. The only safe way to obviate trouble is to quit the service of your employer, if you do not intend to observe the orders of the court as made, and which are binding upon you while that service continues. This you have a right to do; but if you continue in that employment, this court will expect you to do your full duty to your employer and to the public, and to observe the orders which have been made in this case. The high character which the public justly give to the engineers and firemen who serve on our great railways has been earned by innumerable proofs of the most loyal service to employers, and the most heroic and faithful devotion to duties of great peril. The court has the right, therefore, to expect from such men a willing observance of the laws of the land, and due respect for such orders and processes as it may be called upon to make in this case, in the fulfillment of its duties to the public and the parties invoking its jurisdiction."

The hearing of the testimony on the motion for contempt was begun on Tuesday, March 21st, and continued from day to day. Argument of counsel was heard, and the decision of the court was announced on Monday, April 3d. The following is a full and correct copy of the opinion.

Geo. C. Greene and Emory D. Potter, Jr., for Lake Shore & M. S. Ry. Co.

Alexander L. Smith, for complainant.

E. W. Tolerton, for Pennsylvania Co.

Frank Hurd and Jas. H. Southard, for the accused.

RICKS, District Judge, (after stating the facts.) This suit was instituted by the Toledo, Ann Arbor & North Michigan Railway Company, to compel the Lake Shore & Michigan Southern Railroad, the Pennsylvania Company, and other defendants, to receive from it and deliver to it freight and cars destined from one state to another, commonly known as "interstate freight," which it avers the defendants have refused to do since March 11, 1893, because complainant has employed as locomotive engineers in its service men who are not members of the Brotherhood of Locomotive Engineers. The bill further avers that the defendants continue to afford to other railroads full and free facilities for interchange of traffic, thereby illegally discriminating against it. The bill was drawn to enforce the third section of the interstate commerce act, which provides—

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The common carriers subject to the provisions of that act are defined by the statute to be "any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water, when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment from one state or territory of the United States or the District of Columbia to any other state or territory of the United States. * * *"

The subject-matter of this litigation is, therefore, the construction and enforcement of an act of congress, and the court acquires jurisdiction because of the federal question involved. That such question is involved I think too plain for serious controversy. It is sufficient to constitute a case for cognizance by a federal court if it involves but a single ingredient or question dependent on the constitution or a law or a treaty of the United States, although it may at the same time involve any other questions that depend on the general principles of law. Chief Justice Marshall, in Osborn v. Bank, 9 Wheat. 738, considered this point, and came to the following conclusion:

"We think, then, that when a question to which the judicial power of the Union is extended by the constitution forms an ingredient of the original cause, it is in the power of congress to give circuit courts jurisdiction of that cause, although other questions of fact or law may be involved in it."

Remedies of a similar nature might undoubtedly be invoked under statutes and the common law, but the act in question affords the broadest and most effective relief, and the jurisdiction is therefore safely grounded upon that law.

Upon the filing of this bill on the 11th day of March, a mandatory injunction was allowed, directed to the defendants, their agents, officers, servants, and employes, and it was therein ordered—

"That the said defendants, Albert G. Blair, Jacob S. Morris, the Pennsylvania Company, the Wheeling & Lake Erie Railway Company, the Lake Shore & Michigan Southern Railway Company, the Michigan Central Railroad Company, the Cincinnati, Hamilton & Dayton Railroad Company, the Columbus, Hocking Valley & Toledo Railway Company, the Toledo & Ohio Central Railway Company, the Cincinnati, Jackson & Mackinaw Railway Company, and each of them, and their officers, agents, servants, and employes, be, and they are hereby, enjoined and restrained from refusing to offer and extend to said the Toledo, Ann Arbor & North Michigan Railway Company the same equal facilities for interchange of traffic on interstate business between said railway companies as are enjoyed by other railway companies, and from refusing to receive from said the Toledo, Ann Arbor & North Michigan Railway company cars billed from points in one state to points in another state, which may be offered to said defendant companies by the complainant; and from refusing to deliver in like manner to said complainant cars which may be billed over complainant's line from points in one state to points in other states. Ordered that a writ of injunction be issued out of and under the seal of this court as prayed for in the bill of complaint, to remain in force until the further order of the court herein."

The application for this order was made to me at chambers, in Cleveland, late on Saturday night, March 11th. The situation set out in the bill disclosed an emergency in which prompt action was

necessary. I had granted a similar mandatory order in 1891 on a bill for an injunction filed in this court by the Wheeling & Lake Erie Railroad, and it was enforced with beneficent results as against its engineers, firemen, and train men, who had refused to handle interstate commerce freight loaded on cars consigned to various ports on Lakes Superior and Michigan. The bill in this case clearly entitled the complainant to relief as against the defendant railroads, who were threatening to refuse to receive or deliver interstate freight.

The section of the interstate commerce law above quoted made it mandatory upon connecting railroads to receive and deliver passengers and freight, and to afford equal facilities for the interchange of traffic. Corporations can act only through their officers, agents, and servants, so that the mandatory provisions of the law which apply to the corporation apply with equal force to its officers and employes.

It has been urged by counsel for the accused that they should have been made parties defendants, should have been served with notice of the application for an injunction, and that notice of the allowance of the order should have been given to them the same as to the defendant railroads, in order to now authorize the court to find that they had such notice as to hold them for contempt. I do not concede this proposition. As has just been stated, a corporation can act only through its officers and employes, and a duty imposed by law, or by an order of a court of competent jurisdiction, upon a corporation, applies to the officers and employes of that corporation, and takes effect as to them so soon as they are in fact properly notified of the nature and scope of the law or order. Writs of injunction, of whatever nature they may be, when directed to a corporation, always run against it and its agents, servants, employes, etc. The order now before us was so allowed, and it was so issued. It would very much embarrass the courts in administering the law if counsel are right in this contention. The difficulties would almost be insuperable if it were necessary to make all the several thousand employes of the defendant railroads parties before the orders and processes of the court become effective as to them. They belong to the instrumental force of their respective corporations, and in that respect are a part of them. It is therefore sufficient, I think, if in fact they are served with full and proper notice of the orders and processes of the court to make them binding upon them. It is not necessary to make them parties.

The authority of the court to issue such an order has been questioned, but it rests on well-established principles. In Beadel v. Perry, L. R. 3 Eq. 465, a mandatory injunction was granted on motion by Sir John Stuart, V. C. In giving judgment in that case, he said:

"Reference has been made to a supposed rule of court that mandatory injunctions cannot properly be made except at the hearing of the cause. I never heard of such a rule. Lord Cottenham was, so far as I know, the first judge who proceeded by way of mandatory injunction, and he took great care to see that the party applying was entitled to relief in that shape."

In Coe v. Railroad Co., 3 Fed. Rep. 775, when application was made to Judge Baxter, of the United States circuit court, at Nashville, Tenn., for a mandatory injunction restraining the defendant from discriminating against the complainants' business in handling live stock, and especially from inhibiting persons from consigning live stock to complainants' yards, that learned judge said:

"Ought a mandatory order to issue upon this preliminary application? Clearly not, unless the urgency of the case demands it, and the rights of the parties are free from reasonable doubt. The duty which complainant seeks by this suit to enforce is imposed and defined by the law,—a duty of which the court has judicial knowledge. The injunction compelling its performance pending this controversy can do the defendant no harm, whereas a suspension of the accommodations would work inevitable and irreparable mischief to the complainants. The injunction prayed for will therefore be issued."

In the case now under consideration the duty which the complainant seeks to have enforced is defined by the law, and the rights of the parties are free from doubt, so that it seemed a proper case for the order to issue, and it was therefore allowed.

This order was served upon the several defendants, and the Lake Shore & Michigan Southern Railroad, through its general superintendent, Mr. Canniff, made publication of the order in such way as to bring it to the attention of its employes, and particularly to those of its engineers driving engines on the Detroit division, where the interchange of cars with the Ann Arbor road was frequent. On the 18th of March an affidavit made by the superintendent of the Michigan division of the Lake Shore & Michigan Southern Railroad was filed, alleging that certain of its employes, while in the service of said company, and with full notice and knowledge of the injunction theretofore made, had refused to obey the orders of the court, and upon that affidavit an application was made by said company for an attachment to issue against the employes so named, "as being in contempt of the restraining order of the court." The court declined to make the order in the form applied for, but directed one to be entered requiring the engineers and firemen named to appear in court forthwith, and show cause why they should not be attached for contempt. This is the usual and well-established practice in this district, as numerous precedents in the last 10 years will show.

It is said the orders issued in this case are without precedent. Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief. Mr. Justice Brewer, sitting in the circuit court for Nebraska, said:

"I believe most thoroughly that the powers of a court of equity are as vast, and its processes and procedure as elastic, as all the changing emergencies of increasingly complex business relations and the protection of rights can demand."

Mr. Justice Blatchford, speaking for the supreme court in Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. Rep. 243, said:

"* * *. It one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public in the progress of trade and traffic by new methods of intercourse and transportation."

The spirit of these decisions has controlled this court in its action in this case.

Before proceeding to pass upon the evidence as to whether the men now before the court under charges for contempt are guilty or not, it may be profitable to consider the general principles of law applicable to the duties with which the accused were charged by the orders issued to them and to their employers. They were in the employ of the defendant the Lake Shore & Michigan Southern Railroad at the time the orders in this case were made, compelling it to receive from the Ann Arbor road all interstate freight it might tender. The testimony shows that the terms of this order were made known to the employes generally, and that they were thoroughly advised of its scope and mandatory provisions. That their employer was obligated, both under the general provisions of the interstate commerce law and under this order of the court, to receive and haul all interstate freight, must have been known to them. They must also be held to have known that the penalties of the law were severe in case their employer violated either the law or the order of the court. Holding to that employer, so engaged in this great public undertaking, the relation they did, they owed to him and to the public a higher duty than though their service had been due to a private person. They entered its service with full knowledge of the exacting duties it owed to the public. They knew that if it failed to comply with the laws in any respect severe penalties and losses would follow for such neglect. An implied obligation was therefore assumed by the employes upon accepting service from it under such conditions that they would perform their duties in such manner as to enable it not only to discharge its obligations faithfully, but also to protect it against irreparable losses and injuries and excessive damages by any acts of omission on their part. One of these implied conditions on their behalf was that they would not leave its service or refuse to perform their duties under circumstances when such neglect on their part would imperil lives committed to its care, or the destruction of property involving irreparable loss and injury, or visit upon it severe penalties. In ordinary conditions as between employer and employe, the privilege of the latter to quit the former's service at his option cannot be prevented by restraint or force. The remedy for breach of contract may follow to the employer, but the employe has it in his power to arbitrarily terminate the relations, and abide the consequences. But these relative rights and powers may become quite different in the case of the employes of a great public corporation, charged by the law with certain great trusts and duties to the public. An engineer and fireman, who start from Toledo with a train of cars filled with passengers destined for Cleve-

land, begin that journey under contract to drive their engine and draw the cars to the destination agreed upon. Will it be claimed that this engineer and fireman could quit their employment when the train is part way on its route, and abandon it at some point where the lives of the passengers would be imperiled, and the safety of the property jeopardized? The simple statement of the proposition carries its own condemnation with it. The very nature of their service, involving as it does the custody of human life, and the safety of millions of property, imposes upon them obligations and duties commensurate with the character of the trusts committed to them. They represent a class of skilled laborers, limited in number, whose places cannot always be supplied. The engineers on the Lake Shore & Michigan Southern Railroad operate steam engines moving over its different divisions 2,500 cars of freight per day. These cars carry supplies and material, upon the delivery of which the labor of tens of thousands of mechanics is dependent. They transport the products of factories whose output must be speedily carried away to keep their employes in labor. The suspension of work on the line of such a vast railroad, by the arbitrary action of the body of its engineers and firemen, would paralyze the business of the entire country, entailing losses, and bringing disaster to thousands of unoffending citizens. Contracts would be broken, perishable property destroyed, the traveling public embarrassed, injuries sustained, too many and too vast to be enumerated. All these evil results would follow to the public because of the arbitrary action of a few hundred men, who, without any grievance of their own, without any dispute with their own employer as to wages or hours of service, as appears from the evidence in this case, quit their employment to aid men, it may be, on some road of minor importance, who have a difference with their employer which they fail to settle by ordinary methods. If such ruin to the business of employers, and such disasters to thousands of the business public, who are helpless and innocent, is the result of conspiracy, combination, intimidation, or unlawful acts of organizations of employes, the courts have the power to grant partial relief, at least by restraining employes from committing acts of violence or intimidation, or from enforcing rules and regulations of organizations which result in irremediable injuries to their employers and to the public. It is not necessary, for the purposes of this case, to undertake to define with greater certainty the exact relief which such cases may properly invoke; but that the necessities growing out of the vast and rapidly multiplying interests following our extending railway business make new and correspondingly efficient measures for relief essential is evident, and the courts, in the exercise of their equity jurisdiction, must meet the emergencies, as far as possible, within the limits of existing laws, until needed additional legislation can be secured.

The evidence in this case shows in a strong light the unreasonableness of some of the rules and regulations under which employes consent to be governed in their own labor organizations. It appears from the evidence that under the terms of their employment the Lake

Shore & Michigan Southern Railway, though empowered to suspend or discharge its engineers, must thereafter grant them a fair and impartial hearing within a reasonable time, and, if found blameless, they must be paid such wages as they would have earned during the time of suspension or discharge. But the engineers, on their part, by their action in this case, claim the right to quit the company's service without a moment's notice, and without cause. Every engineer and fireman conceded on the witness stand that he was perfectly satisfied with his wages, perfectly satisfied with his hours of labor, and with his employer in every respect, and would be glad to continue in the company's employ; but admitted that he had quit the service arbitrarily, and without notice, because of the boycott against the Ann Arbor road. While denying that there had been any understanding or agreement, or any rule or notice by which all had arbitrarily left the company's service, the evidence shows such a uniform line of action, such a unanimity in the manner of quitting, and in the reasons assigned, as to convince me that there was a common design and a common purpose in what they did. Each one of them admitted that when he was asked if he would continue in the company's employ and obey the order of the court if the boycotted cars or freight were taken out of his trains, he had agreed to do so. This clearly shows that they were controlled in their acts, not by any grievance they had against their own employer, but by a rule or order, which has since been brought into court, and which my associate, Judge Taft, will deal with in his opinion. 54 Fed. Rep. 730.

Now, let us apply these general principles of equity, which are consistent with every rule of natural law and justice, to the facts of this case, so far as they affect those now charged with contempt of court. The evidence shows that, according to the rules and custom of the company, the engineers were paid $3.75 for a run of 100 miles, and were paid for overwork. The time for computing compensation began at the hour they were called to leave the yard, and ended when they gave up their engines in the yard, and they were entitled to pay for that time, even though their engines did not move a wheel. Their service was therefore due to the company from the hour when their compensation began. The period of service continued during the time usually occupied in making the run for which they were called. During that period they were constantly subject to the orders of the company, and by custom and usage the relation of employer and employe was in force for that time. This is the most limited period that can be claimed for their term of service under the evidence before me. On the afternoon and night of the 17th of March a train of cars was made up in the yards of the Lake Shore & M. S. road at Air Line Junction, destined for Detroit. About 6 o'clock P. M., Engineer Clark and Fireman Thompson were called to make the run. They prepared their engine, ran it into the yard, and backed down to within a half car length of the train, and, before coupling it, learned that the first seven cars were billed for Alexis, and intended for the Ann Arbor road. Thereupon Clark took his clothes from his box, announced to an officer of the company that he would quit its service, and, proceeding to the office, turned over his

book of rules to the officer in charge. A call was then sent out for Engineer Case and Fireman Kessler. They brought their engine to the train, coupled it, and, on learning from the conductor that seven cars were to be delivered at Alexis, Case said he would quit the service, and did so. A call was then sent out for Engineer Rutger and Fireman James, and their engine was brought out and coupled to the train. When Rutger learned that Alexis cars were to be delivered, he quit his employment, and left the yard, having turned over his book of rules. A call was then sent out for Engineer Conley and Fireman Westgate, whose engine was in the same way coupled to the train. Conley declined to haul the Alexis cars, and quit the company's employment. He offered to run the train out if the obnoxious cars were removed. It is unnecessary to state the evidence more in detail. The proof is clear that all of these engineers and firemen fully understood the order of the court, and knew that if they continued in the company's service they would be compelled to obey it. Rather than do that, they quit their employment. Had they the right to do so under the circumstances surrounding them? The train which they refused to haul was safely stored in the company's yard. No special injury resulted from their refusal to continue in the service. No lives were imperiled, and no property jeopardized by their act. These facts clearly present extreme cases, where a court of equity is asked to enforce the performance of contracts for personal service. The engineers were all bound, by their terms of employment, to haul that train to Detroit. They had been regularly called for service, and entered upon it, and were in law obligated to continue in that service for the period of 12 hours, which covered their run. They have broken their contract, and their employer has its remedy at law, inadequate though it be.

But this court recognizes to its fullest extent the large measure of personal liberty permitted to employes, and, while it feels they have violated their contract of service, it disclaims any power to compel them to continue that service against their will, under the facts of this case. The insuperable difficulties attending an attempt to enforce the performance of contracts for continuous personal service have heretofore deterred courts of equity from undertaking to grant relief in such cases. But in the varying circumstances under which the employer's rights to such relief are presented it often happens that adequate protection is possible by restraining the employes from refraining to do acts which they have combined and conspired to do, and the inhibiting of which secures the relief to which the employer is clearly entitled. By such modes of procedure courts of equity are often able to afford protection where they could not do it by attempting to enforce specific performance. But it is urged that, while the court might not have had the power to compel performance of service in these cases, it has power to punish for contempt those who refused to obey its orders. But if the court could not compel the employe to perform by continuing in service, it would not be a contempt of court on the employe's part to exercise the right to quit the service. If the employe quits in good faith, unconditionally and absolutely, under such circumstances

as are now under consideration, he is exercising a personal right which cannot be denied him. But so long as he continues in the service, so long as he undertakes to perform the duties of engineer or fireman or conductor, so long the power of the court to compel him to discharge all the duties of his position is unquestionable, and will be exercised. As hereinbefore intimated, the duties of an employe of a public corporation are such that he cannot always choose his own time for quitting that service, and so long as he undertakes to perform and continues his employment the mandatory orders of the court to compel all lawful service can reach him and be enforced. The circumstances when this freedom to quit the service continues and when it terminates it is not now necessary to determine, but there certainly are times and conditions when such right must be denied.

The cases cited by counsel in which public officers have not been permitted to resign to avoid the mandatory orders of a court do not apply here. A different principle is there involved. In most cases the tenure of office continues until a successor is chosen and qualifies. The officer chosen and exercising the functions of his office owes a duty to the public, and is charged with an obligation to perform certain acts which he ought not to be permitted to evade by resignation. The rule of law that holds such a person, even against his will, to his post of duty, to protect the public against an omission to perform a duty which is necessary for its good, and perhaps for the continuous and safe operation of the government in some of its forms, cannot be justly applied to an employe laboring, perhaps, only under an implied contract, who sustains quite a different relation both to the public and his employer.

It is our duty to deal with the facts of these cases as they are presented. The parties now charged with contempt must be tried on those facts as they have been made to appear; and, having fully considered them, I conclude that Engineers Clark, Case, Rutger, and Conley, and their firemen as named, were not guilty of violating the orders of the court while in the service of their employer, as alleged in the affidavit charging them with contempt, but quit the service of the Lake Shore & Michigan Southern Railroad under circumstances when they had a right to do so, and that they are not, therefore, in contempt of court because of such conduct, and they will be discharged. In reaching this conclusion I have treated these cases as criminal in their character, and given the accused the benefit of the reasonable doubt, especially as to the extent to which they had conspired to act concertedly in quitting the service in a way to injure their employer and aid in enforcing a boycott. An act, when done by an individual in the exercise of a right, may be lawful, but when done by a number conspiring to injure or improperly influence another may be unlawful. One or more employes may lawfully quit their employer's service at will; but a combination of a number of them to do so for the purpose of injuring the public and oppressing employes by unjustly subjecting them to the power of the confederates for extortion or for mischief is criminal. We do not, therefore, here determine that a conspiracy entered

into by the employes of one railroad to boycott another railroad may not exist under such circumstances of aggravation as to make it entirely proper for a court of equity, in dealing with such conspiracy, to prevent an employe from quitting the service in which he is engaged solely as a means of carrying out his part in such conspiracy, and for no other purpose than to aid in enforcing such boycott.

But the conduct of Engineer Lennon presents quite a different case. He was on his run from Detroit to Air Line Junction with a train of 45 cars. He reached Alexis station at 10:07 A. M., and was there ordered to take an empty car from the Ann Arbor "Y" for Air Line Junction. This was one of the boycotted cars. He refused to switch the car into the train, and held it there, against positive orders, from 10:07 A. M. to 3:15 P. M., and then proceeded on his run, after receiving a dispatch from the chairman of the grievance committee which read as follows: "You can come along and handle Ann Arbor cars." That message meant that the boycott had been raised. Though Lennon had been twice ordered by telegraph by the officers of the road to come on with his train, he refused to do it, but promptly moved it when he got permission to do so from one who had no official relation to the company, and no right to interfere with the movement of its trains. When he received the order at Alexis to take the Ann Arbor car, he refused, and said, "I quit." He afterwards agreed with the superintendent of the Detroit division to take his train to its destination, if the order to take the boycotted car was countermanded. He remained with his engine, and brought his train to Air Line Junction. When he arrived at that point, as the termination of his run, he says in his testimony that "the caller told me when I registered, 'You get 134.' I said, 'All right, I'll be up.' It was his duty to give me such notice." Though he claims to have quit at Alexis about 10 o'clock in the morning, he brought his train to its destination, and, when told what his next run would be, gave no notice of having quit, or of intending to quit. This is satisfactory evidence that he did not quit in good faith in the morning, but intended to continue in the company's service, and that his conduct was a trick and device to avoid obeying the order of the court. He admitted having seen the court's order, when confronted with it at Alexis. It was shown to him in printed form, easily to be read and understood. Chilcote, the agent at Alexis, and Keegan, the brakeman on Lennon's train, both swear positively to this important fact. From his own admissions he had sufficient knowledge of its nature to at least put him upon inquiry as to its exact scope and effect. He knew it related to his duties as engineer under the very conditions then confronting him, and, if he had been anxious to do his duty and respect the orders of the court, he had an exceptionally good opportunity to read and fully consider it during the five hours he was holding that train at Alexis against the positive orders of his superior officers. But he failed to so further inform himself, and persisted in his defiance both of the rules of his employer and of the injunction of the court during all the hours mentioned. I cannot conceive of any principle of law

under which such conduct can be justified. An engineer cannot be permitted to pretend to quit the service of his company in the manner stated, with his train on the main track, 10 miles from his destination, and for the evident purpose of evading an order of court which was equally in force against employer and employe. If such an abandonment of service could be excused in law, it would leave this great corporation, operating 1,500 miles of railway, and moving several hundred trains of cars per day, at the mercy of its employes, and subject the public, with its multitude of interests and rights, to irremediable injuries and losses. Upon the facts of the case made against Engineer James Lennon, I find that he did not quit the service of the company in fact, and did not intend to do so, and that his pretense to do so was a trick to evade the order of the court. Being in the service of the company when he refused to switch the Ann Arbor car into the train at Alexis, and having then full knowledge of the terms and meaning of the order of the court, that order was then in full force, and commanded him to do the very thing he refused to do. He therefore deliberately and knowingly violated the mandate of the court, and was guilty of contempt. I accept the protestations of Mr. Lennon, made under oath, that he did not intend to disobey the orders of the court, and did not believe he was violating the laws of the United States. He is a member of the Brotherhood of Locomotive Engineers, and supposed that while acting under its rules he was not arraying himself against the laws of his country. This suit has afforded the court an opportunity for declaring the laws applicable to such emergencies, and the public interests have been thereby subserved. This does not, therefore, seem to me to be the occasion when it would be wholesome or wise to administer an exemplary punishment. The object of the court is to uphold and vindicate the laws, without, under these circumstances, showing a disposition to oppress or punish those who have evidently been misled. With these views of my duty, an order will be entered that the accused, James Lennon, stands adjudged as guilty of contempt, and pay a fine of $50, and the costs of this proceeding, upon payment of which he will be discharged from the further orders of the court.

The orders made in this case as to all the connecting roads and their employes who have continued in the service are still in full force, and it is but just to all concerned that the court should say, that the laws and orders having now been fully interpreted and made public, any violations thereof that may hereafter occur will be dealt with in a spirit and purpose quite different from those which have controlled us in this case.