**CRESTWOOD PARK, INC.,**
**Defendant–Appellant,**

v.

**Joseph APOSTAL, Plaintiff–Appellee.**

**No. 3–178A22.**

Court of Appeals of Indiana,
Fourth District.

Dec. 17, 1980.

Rehearing Denied Jan. 29, 1981.
See 415 N.E.2d 757.

---

do under the agreement concerning having Oakwood Drive improved with curbs, streets, and storm sewers, supported by the evidence or contrary to the evidence?; 2) Was the trial court's finding no. 15A, that the plaintiff is entitled to damages in the sum of $7,000 for loss of profits on the sale of seven lots in Oakwood Drive, supported by the evidence or "ascertainable from the evidence?"; 3) Was the trial court's finding no. 17, that the defendant and its officers, in an attempt to frustrate and defeat any recovery plaintiff might obtain, dissipated and concealed all assets of the corporation by transferring the title to all of the lots in the subdivision into a secret trust wherein the sole beneficiaries thereof are the sons of the officers, and by dividing the cash accumulation between themselves, an issue before the court and supported by the evidence?

The parties to this 1976 lawsuit are Crestwood Park, Inc., a corporation whose primary asset was an undeveloped, although platted and approved subdivision located in Hobart, Lake County, Indiana, and Joseph Apostal, one of the original owners of the Crestwood corporation. The corporation had been organized and owned by Arthur Lisak, Philip Flanagan, and Joseph Apostal. In 1959, the three owners of Crestwood entered an agreement whereby Apostal terminated his relationship with the corporation, and whereby the subdivision known as Crestwood Park was divided between Apostal and the corporation. Additionally, the agreement provided for the future development of the subdivision. After entering this agreement, Apostal advised Crestwood numerous times by telephone that he wanted to begin improvements for his lots. Crestwood's response to Apostal was either "no" or that the officers of Crestwood would talk about it. On January 10, 1963, Apostal wrote Crestwood advising that he desired to put in sanitary sewers and that if he (Apostal) did not get a response from Crestwood he would seek "Barrett Bond" financing. When Crestwood did nothing toward making the necessary improvements, Apostal entered into a recapture

Duane W. Hartman, Blachly, Tabor, Bozik & Hartman, Valparaiso, for defendant–appellant.

Lowell E. Enslen, Gary K. Matthews, McHie, Enslen & Moran, Hammond, for plaintiff–appellee.

YOUNG, Presiding Judge.

Crestwood Park, Inc., appellant–defendant, appeals from a judgment entered for Joseph Apostal, appellee–plaintiff, for the breach of a subdivision development agreement. Crestwood attacks three findings of fact entered by the trial court, as follows: 1) Was trial court's finding no. 3, that the plaintiff did all things he was required to

agreement with the City of Hobart whereby Apostal installed the sanitary sewer improvements and would be reimbursed for that expense out of the tie—on fee charged each lot owner by the City. This recapture agreement was made in 1964. After the 1964 recapture agreement with the City of Hobart and continuing to 1972, Apostal would contact Crestwood several times each year and advise it that he wanted to further improve his lots by putting in paved streets, curbs, gutters, etc. Again, Crestwood failed to take any action. Apostal sought Barrett Bond financing through the City of Hobart in order to make further improvements on his lots on Oakwood Drive. Financing was to be obtained through the general improvement fund (rather than by Barrett Bonds) of the City of Hobart. Public hearings were held on the project and bids were submitted. Among the three bids submitted was one made by Arthur Lisak, the president of Crestwood. Lisak eventually was the successful bidder. However, Lisak then remonstrated against the improvements project and stated that the City of Hobart would be sued if the contracts were let. The City of Hobart then tabled the Oakwood Drive improvements project.

The issues center on the following provisions of that 1959 agreement:

BOTH PARTIES AGREE:

1. That they will cooperate fully with each other in the full, rapid, efficient and economical development of all lots in Crestwood Park Second Subdivision which are not now fully developed. It is understood that certain streets must be paved, curbs laid, storm and sanitary sewers installed and gas, electricity and water made available to each lot.

2. If either party desires to have Oakwood Drive paved, then it shall be paved all at one time from Third Avenue to West Second Place under terms as hereinafter provided. If either party desires to pave Driftwood Drive or West Second Place and/or install curbs in said streets, each street shall be paved and/or curbed in its entirety at one time under terms as hereinafter provided. If either party desires storm sewers or sanitary sewers con-

structed in any block or upon any street, then said sewer shall be constructed for one whole block or one whole street, as the case may be, at one time.

3. If either party hereto desires curbs, streets, storm or sanitary sewers to be installed in or on any block or street, each party shall have the opportunity to bid the prices at which he or it would be willing to perform the work, and either party may invite other contractors to bid. The lowest responsible bidder shall obtain the job if both parties agree. If both parties cannot agree on this method, then either party will be free to attempt to obtain any desired improvements under the provisions of the Barrett Law.

4. If improvements are made but are not made under the Barrett Law, the total cost of installing curbs and streets shall be distributed between the parties on a front footage basis, and for the purpose of this clause, front footage may include the side of a corner lot along which a curb or street is laid.

## I.

■ Crestwood attacks the finding that Apostal did all the things required of him under the agreement concerning the improvement of Oakwood Drive with curbs, streets and sewers as not supported by the evidence. In particular, appellant Crestwood argues there is no evidence Apostal submitted any bids or delivered any plans to Crestwood prior to entering a 1964 contract for the installation of sewers with the City of Hobart thereby breaching the subdivision development agreement. Crestwood argues these are conditions precedent to financing improvements under the agreement quoted above. Curiously, Crestwood does not argue that it was not given the opportunity to bid. Paragraph 3, quoted above in full, states each party shall have the opportunity to bid. With the principles of contract construction and interpretation and our standard of review in mind, we believe the trial court could reasonably have found that the requirement that each party have the opportunity to submit a bid does

not require any one of them to submit a bid. The agreement contemplates that both parties may not agree on this procedure and provides for alternative financing. The thrust of appellant's argument would require of Apostal that which is not required by the agreement, that is to actually submit a bid.

Within Crestwood's attack on this finding is the argument that plaintiff's 1964 recapture agreement with the City of Hobart was, itself, a breach of the 1959 agreement. We agree with the general rule set out by Crestwood, that is where a person breaches a contract, he has no grounds to complain when the other party does not follow the terms of the contract. However, even assuming the 1964 agreement between Apostal and the City of Hobart was a breach, it was not so significant to prevent enforcement of the 1959 agreement by Apostal. There is no evidence or argument presented as to the extent of any prejudice regarding a breach by entry of the recapture agreement. Although Apostal may not be entirely free from fault, he has substantially done all things required of him under the agreement. The finding no. 3 of the trial court, in this regard, is not clearly erroneous. We note that the record does demonstrate that Crestwood has sold some of its lots that have been required to hook-up to the sanitary sewer constructed under the 1964 recapture agreement. To allow Crestwood to sell the lots which would not have been possible without the installation of the sewers and also to allow them to argue that the same was a breach of the 1959 agreement would be unfair.[1]

Also within this same argument, Crestwood states it was justified in remonstrating against the improvements on Oakwood Drive because Apostal did not submit bids and plans, and because the City of Hobart proposed to finance by a general improvement bond rather than a Barrett Bond. The issue made concerning the requirement that Apostal submit a bid for these improvements is resolved in the same manner as it was for his failure to submit bids for the 1964 recapture agreement to install sewers. Again, Crestwood fails to argue any prejudice which was incurred because the City of Hobart would not use a Barrett Bond to finance, but rather used a general improvement bond as a means of financing. Nor does Crestwood argue at trial or on appeal, that the use of alternative financing is such a material alteration of their agreement so as to prohibit enforcement thereof. In fact they argue such alternative financing was their justification for remonstrating, which argument justifying remonstration is collateral to the issue of the remonstration as a breach of the agreement.

## II.

Crestwood next alleges the trial court's finding that plaintiff is entitled to $7,000 damages for "loss of profits" on the sale of seven lots is erroneous because it is not supported by or ascertainable from the evidence. Apostal of course argues there is more than sufficient proof of lost profits from which the trial judge could assess damage in the amount of $7,000.[2] We note

1. Crestwood makes no argument that it was somehow harmed or prejudiced by the installation of the sewers. The spirit and intent of the contract was to jointly develop this subdivision. While Apostal arguable may not have complied with the letter of the agreement, he has certainly tried to develop the subdivision under the agreement.

2. Apostal contends the record does support the award and quotes the following:

Mr. Enslen: Q. ... Now, have you computed the amount on those lots in Oakwood that you would have made as a net profit on the sale of those seven lots had the improvement gone in and you'd been able to sell them? A. Well I'd think you could make right around Eighteen Hundred Dollars a lot. Q. And at Eighteen Hundred Dollars, if my mathematics is correct, that comes out to $13,600.00. [7 Lots × $1800 lot = $12,600] Would that have been your net profit— A. Well I— Q. —after the cost of improvements? A. Right, after that. Apostal also testified that the 1972 value of the lots had they been improved would have been approximately $3600 per lot and the 1976 (at the time of trial) value had they been improved

that our standard of review is to examine, without weighing or judging credibility, the evidence and reasonable inferences therefrom in a light most favorable to the judgment below. If from that viewpoint the evidence does not support the judgment, we will reverse.

■ The measure of damages for delay in performance or failure to timely perform is the actual loss sustained. Where the property involved is real property, damages are generally measured by the rental value of the property involved. 22 Am.Jur.2d *Damages* § 50 (1965). However, special damages may be recoverable if within the reasonable contemplation of the parties at the time of making the contract, provided they can be ascertained with reasonable certainty. *Id.* The amount of damages awarded must be within the scope of the evidence. *Prudential Insurance Co. v. Executive Estates, Inc.,* (1977) Ind.App., 369 N.E.2d 1117; *Wolff v. Slusher,* (1974) 161 Ind.App. 182, 314 N.E.2d 758. Also, a party injured by breach of contract is "limited in recovery to the loss actually suffered; he is not entitled to be placed in a better position than he would have been if the contract had not been broken." *Jay Clutter Custom Digging v. English,* (1979) Ind.App., 393 N.E.2d 230, 234–35; 9 I.L.E. *Damages* § 127 at 289 (1971). Based not only on Apostal's recitation of the evidence, but also reviewing the evidence ourselves, we believe the portion of the judgment awarding damages for loss of profits on the sale of the seven lots is erroneous. The amount of damages awarded when based upon the proper measure of damages is not within the scope of evidence, *Prudential Insurance Co., supra,* and places Apostal in a better position than

had the agreement been kept, *Jay Clutter Custom Digging, supra.*

Apostal's loss must be measured by the reduction of profits (or stated another way, the increased cost of the improvements and corresponding reduction of profits) caused by Crestwood's breach. The dissent seems to agree with the measure but applies the measure incorrectly to these facts. Apostal has not shown by the evidence any profits as yet actually lost.[3] The reduction of profits or "loss of net profits" as termed by the parties in this case would have been demonstrated by showing for example without limiting such elements, the increased cost of improvements above the cost already secured by Lisak's bid or the increased costs of holding and financing the lots. There is no evidence of either of these costs in the record.

A situation which would support an award for loss of profits is a lost opportunity breach. For example, in *Jerry Alderman Ford Sales, Inc. v. Bailey,* (1972) 154 Ind.App. 632, 291 N.E.2d 92 the loss of net profits measure of damages was employed when use of a truck was lost for eight weeks. The truck was used for hauling purposes and when it failed to properly perform business profits were forever lost. In our case, the profits have not been shown to be forever lost. Lost profits would be more appropriate in a case where the opportunity to develop was forever foreclosed. Apostal had the burden to show this, not to merely raise the question that such a problem might exist. Otherwise recovery is had twice, once at trial and then upon future sale after improvement.

■ By awarding lost profits without regard for the actual harm caused by the

---

would have been approximately $4200 per lot. This $600 increase in value is characterized by Apostal, himself, as a $600 net loss per lot as a result of Crestwood's breach. (Brief p. 21) Apostal testified the unimproved value of each lot in both 1972 and 1976 was approximately $1000. Appellee also points to a $460 outlay for property taxes from 1972 to the time of trial and $1000 attorney fees apart from the institution of this suit as evidence of his loss. Appellee has set out only the above recited evidence in support of the judgment.

**3.** It is not the reasonable ascertainment of the $1800 in costs/profits with which we quarrel, *rather* it is proof of the loss of these profits caused by the breach. The market value/sale price of $3600 at the time of the breach is reduced by the cost of development in determining the amount of profit. The increased costs and concurrent decrease of profit (sale price remaining constant) is what Apostal should recover.

breach of Crestwood, the trial court has placed Apostal in a better position than had the contract been performed. The dissent has correctly stated the applicable measure, quoting from 9 I.L.E. *Damages* § 127 (1971), but has again failed to properly apply the measure to these facts. In the case here, Apostal is entitled only to the reduction of net profit, i. e. the actual loss, occasioned by the breach. Because Apostal failed to demonstrate the increased cost of the improvements after Crestwood's breach, there is no basis in the evidence for the award herein. We, therefore, find this damage to be erroneous because it is not ascertainable from the evidence.

 Finally, Crestwood argues the trial court had no jurisdiction to enter any order directed at the officers of the corporation. We need reach the question because a portion of the judgment rendered is not raised for review and will still be subject to satisfaction. The order has not made the officers of the corporation personally liable in any way or affected their personal holdings. It only directs their actions as officers of the corporation in particular, their placing the assets of the corporation into a trust. In fact, they are named in the finding of fact attacked as officers of the defendant corporation. They would have been bound by an order directed at the defendant corporation even without having been named because a corporation can act only through its officers. *Toledo A. A. & N. M. Ry. v. Pennsylvania Co.*, (N.D.Ohio 1893) 54 F. 746. However, the officers may not have the power to act upon the trust, having transferred title to the trust. In a case such as that, the general rule is that the transferee may be held liable where a transaction is an attempt to avoid a debt. 19 Am.Jur.2d *Corporations* § 1546 (1965); 19 C.J.S. *Corporations* § 1380 (1940). Since the parties have not seriously argued this on appeal we leave a more complete resolution of this problem to proceedings in which the debt will be satisfied.

The judgment of the trial court is reversed insofar as it erroneously determines the amount of damages based on lost profits. The remainder of the judgment is affirmed.

Reversed in part; affirmed in part.

CHIPMAN, J., concurs.

MILLER, J., dissents with opinion.

MILLER, Judge, dissenting.

I dissent.

I disagree with the majority's characterization of the evidence in this case as being too speculative to support the award of the trial court. The plaintiff–appellee, Joseph Apostal, owner of the subdivision lots in question and an experienced residential subdivision developer, testified that at the time of the breach his seven lots each had a value of $1,000. Further, with the added improvements (prevented by Crestwood's breach of contract), Apostal opined each lot had a sale value of $3,600. He estimated his lost net profit per lot, after improvement costs, at $1,800, thus establishing the improvement expenses at $800 per lot. Other evidence substantiated his estimate of expenses. The accepted bid for the street, curb, and storm sewer improvements on Oakwood Drive was $9,103.25. There were 14 lots on the street, seven owned by Apostal and seven by Crestwood. Dividing the improvement cost among the 14 lots on the street, we arrive at a figure of $650 per lot for cost of the actual improvements. The other $150 per lot allocated by Apostal for expenses does not seem unreasonable in light of the normal legal and other expenses of closing, i. e. preparation of deed, title insurance, etc. I therefore conclude the evidence of profits lost by Apostal "while not sufficient to put the amount beyond doubt, is sufficient to enable the [trial court] to make a fair and reasonable finding with respect thereto." *Jerry Alderman Ford Sales, Inc. v. Bailey*, (1972) 154 Ind. 632, 653, 291 N.E.2d 92, 106.

Nor can I agree with the majority's position that Apostal, by recovery of $7,000, "will be placed in a better position than he would have been if a contract had not been broken and the lots improved and sold," basing its conclusion on evidence that the

lots if improved at the time of trial retained their profit potential. Here, I believe the majority has applied an incorrect measure of damages. It is stated in 9 I.L.E. *Damages* § 127 (1971) that "[t]he measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of a contract would have prevented or the breach of it has entailed." Further, "[a]s a general rule, the damages upon breach of contract are to be measured as of the date of the breach. Under this rule, fluctuations in value after breach do not affect the recovery allowed." 22 Am.Jur.2d *Damages* § 51 (1965). Thus, for example, it has been held that for a breach of contract to purchase real estate the measure of damages is the difference between the price of the property as fixed in the contract and the fair cash value at the time of the breach. *Foster v. Klinger*, (1931) 92 Ind. App. 700, 175 N.E. 136; *Goodwine v. Kelley*, (1904) 33 Ind.App. 57, 70 N.E. 832; *Farmers and Citizens Building, Loan Fund and Savings Association v. Rector*, (1899) 22 Ind. App. 101, 53 N.E. 297.

Evidence in the case at bar reveals that after the breach Apostal retained seven unimproved lots, each with a value of $1,000. Had he sold the lots at that time and at that figure he would have sustained the loss of net profits which would have been realized had the lots been improved. However, he elected not to sell, and admittedly, some four years later at trial, evidence was admitted indicating the lots had a potential profit similar to that which had existed at the time of breach. However, Apostal also testified that he had been denied the right to tap new sewers into the Hobart sewer system, thereby raising the question as to whether such potential actually existed. I believe the possible value of the property some four years after Crestwood Park's breach is evidence too conjectural in nature to be considered in measuring damages in this case. Further, I believe the testimony of Apostal concerning the unavailability of city sewers, although meager, was sufficient to support a conclusion by the trial judge that the lots in question had lost their full development potential because of Crestwood's breach of contract.

The $7,000 damage award of the trial court was within the evidence and arrived at by application of the proper measure of damages. The judgment of the trial court should be affirmed.