# FERDINAND M. ARNREICH *v.* STATE OF MARYLAND.

*State Traders' Licenses—To Whom Requirement Applicable—*
*Proprietors Of Market Stalls—Exemption Of Manu-*
*facturers—Contemporaneous Construction*
*Of Statute.*

The provisions of Acts 1922, ch. 316, and Acts 1924, ch. 138 (Code, art. 56, sec. 7), authorizing the inspectors appointed by the Comptroller of the Treasury as therein provided, to institute, with the latter's approval, proceedings for the prosecution of persons, firms, or corporations failing to procure a license, did not repeal Code, art. 56, sec. 6, which makes it the duty of sheriffs and constables to institute such proceedings.

pp. 93-95

If a grand jury has sufficient evidence that a person or corporation is conducting a business which requires a license, without having such license, it can indict such person or corporation upon its own motion or upon any evidence adduced before it. p. 96

Even if approval by the Comptroller of a prosecution for breach of the state license law were a prerequisite of conviction, the indictment need not show such approval, this being a matter of defense. p. 96

One who cleans and cuts up fish for the purpose of sale, or who, after buying whole carcasses of animals, cuts them up into parts suitable for sale to his customers, is not a manufacturer, within the exemption of manufacturers from the requirement of Code, art. 56, sec. 42, that any person selling goods, wares, and chattels, shall first obtain a license. pp. 96-97

Courts should refrain from putting on a statute an interpretation differing from that applied by administrative officials, except for the most potent and urgent reasons. p. 101

Since the requirement in Code, art. 56, sec. 42, as to the taking out of traders' licenses, has been a part of the statute law of the state for at least fifty years, without the state admin-

istrative officers having made any demand that stall owners in the Baltimore city markets take out such licenses, and since the Legislature has apparently acquiesced in this construction of the statute, as not applying to such stall owners, by amending the statute by Acts 1880, ch. 349, and making it part of the law of the state by its insertion in the Code of 1888, without any specific inclusion of such owners among those required to obtain a license, this construction will be adopted by the Court of Appeals.                                      pp. 101-106

*Decided February 19th, 1926.*

Appeal from the Criminal Court of Baltimore City (DUFFY, J.).

Criminal proceeding against Ferdinand M. Arnreich. From a judgment of conviction, said Arnreich appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Roland R. Marchant* and *A. Walter Kraus,* with whom were *Lindsay C. Spencer* and *Marchant & Kraus* on the brief, for the appellant.

*Willis R. Jones, Assistant Attorney General,* with whom were *Thomas H. Robinson, Attorney General,* and *Herbert R. O'Conor, State's Attorney for the City of Baltimore,* on the brief, for the State.

DIGGES, J., delivered the opinion of the Court.

Ferdinand M. Arnreich, George Weil and George H. Sloatfield were separately indicted and convicted in the Criminal Court of Baltimore City for the violation of section 42 of article 56 of the Annotated Code of 1924. This section provides:

"No person or corporation other than the grower, maker or manufacturer shall barter or sell or otherwise dispose of, or shall offer for sale any goods, chattels,

wares or merchandise within this State without first
obtaining a license in the manner herein prescribed."

Each of these parties was, in separate trials, adjudged
guilty and sentenced to pay a fine of one dollar and costs.
From these judgments the respective defendants have prose-
cuted appeals to this Court. In this court, the three appel-
lants being represented by the same counsel, their cases
were argued together. In the lower court there was on
behalf of each defendant a motion to quash the indictment
filed, which being overruled, a demurrer was then filed,
which also was overruled by the lower court; there was then
filed on behalf of each defendant four special pleas in bar,
to which said plea in bar the State demurred, which de-
murrer the lower court sustained. Whereupon the plea of
not guilty was entered and upon this plea the trial proceeded
and resulted as above stated.

The first contention of the appellants is that their motion
to quash and demurrer to the indictments should have been
sustained, for the reason that the indictments should have
shown affirmatively on their face that the prosecution was
with the approval of the Comptroller of the Treasury. This
contention is based upon the language of chapter 138 of the
Acts of 1924, now codified as section 7 of article 56 of the
Code of 1924. This section, after providing for the appoint-
ment by the Comptroller of the Treasury of a chief inspec-
tor of state licenses and three assistant inspectors of state
licenses, provides:

"And the Comptroller of the Treasury is hereby au-
thorized and empowered to superintend the issuance
of all licenses by the clerks of the several courts of
this State, and he is further empowered to investigate,
through the said inspectors to be appointed under this
section, the adequacy of all licenses applied for and
issued by the clerks of the several courts of this State
to the end that all persons, firms and corporations re-
quired to procure licenses under the laws of this State
shall procure the same according to the laws thereof.

and the said inspectors, with the approval of the Comptroller of the Treasury, shall institute proceedings for the prosecution of all persons, firms or corporations failing to procure a license or a license for an adequate amount, said prosecution to be in accordance with Section 6 of this Article, and the Comptroller of the Treasury is hereby empowered to have general supervision over the license laws of this State. Provided, however, that any law or part of law under which the State Tax Commission has exercised or may exercise any authority similar to that conferred upon the State Comptroller by this section, be and it is hereby repealed to that extent, it being the purpose of this section to concentrate in the office of the State Comptroller the power to supervise the issuance of all licenses issued by the clerks of the several courts of this State, and that this power shall be exercised by no other official."

Section 6 of article 56 of the Code of 1924 provides:
"It shall be the duty of the sheriffs and constables of the several counties and Baltimore City, and the agents and inspectors of the State Tax Commission of Maryland to make diligent inquiry of all persons, firms and corporations doing business in this State, and apprehend and take before some Justice of the Peace, all persons, firms and corporations found doing business without a license, as may be required by law, to be committed or held to bail for appearance at the succeeding term of the Circuit Court for the county or Criminal Court of Baltimore City to answer the charge of selling goods without a license."

And further provides for the penalty upon conviction.

Section 7 of article 56 was the re-enactment with amendments, by chapter 138 of the Acts of 1924, of chapter 516 of the Acts of 1922, and the only change made by the Act of 1924, chapter 138, was to empower the Comptroller of the Treasury to appoint four inspectors of state licenses, one to be designated as chief inspector and the other three assist-

ant inspectors, in the place of a single inspector, as provided
by the Act of 1922. Prior to the enactment of chapter 516 of
the Acts of 1922, the State Tax Commission had authority
to supervise the issuance of certain licenses, and the effect
of the proviso in that act, also contained in the Acts of
1924, ch. 138, was to withdraw from the State Tax Com-
mission the authority to exercise this supervision, and to
concentrate it in the office of the Comptroller of the Treas-
ury. It is true that the Acts of 1922, ch. 516, as well as
section 7 of article 56 of the present Code, authorized the
inspectors appointed by the Comptroller to institute pro-
ceedings for the prosecution of all persons, firms or corpora-
tions failing to procure a license, or a license for an ade-
quate amount, but this provision does not repeal section 6
of article 56, which makes it the duty of the sheriffs and
constables of the various counties and Baltimore City to
apprehend and institute proceedings for the conviction of
all persons who have failed to take out a license as required
by law. In other words, the authority given to the license
inspectors, with the approval of the Comptroller, is in addi-
tion to and not in lieu of the provisions of section 6 of article
56. This, we think, is the proper construction of the lan-
guage used, and was evidently the legislative intent. To
give it any other construction would be to say that the Legis-
lature, after declaring the failure to take out a license by
all persons who by law were required to do so, was a mis-
demeanor and punishable by fine and imprisonment, meant
that they could only be convicted, or proceedings leading to
their conviction could only be instituted, by warrants sworn
out by the inspectors of licenses with the approval of the
Comptroller. It is clear that the Legislature could not have
had such an intent, but left the violation of this law to be
punished by information furnished as in all other violations
of law, and in addition thereto, made it the specific duty of
all sheriffs and constables to apprehend violators of this law,
and also imposed a similar duty on the inspectors of licenses
with the approval of the Comptroller. We do not think that

the approval of the Comptroller must be apparent upon the face of the indictment or warrant, even if the approval of the Comptroller in these particular cases were a prerequisite of conviction, as this would be properly a matter of defense; but this question is immaterial, because it is our view that if a grand jury had sufficient evidence that a person or corporation is conducting such a business as the law requires that a license shall be taken out therefor, without having such license, it undoubtedly could indict such person or corporation for violation of the law, upon its own motion or upon any evidence adduced before it. All of the defendants admit that they have no license.

The next contention is that the appellants are not required to take out the license provided for by section 42 of Article 56 because this section by its terms has no application to the grower, maker, or manufacturer, and it is contended that the appellants are manufacturers. The testimony shows that all three of the defendants conducted stalls in Lexington Market in the City of Baltimore, from which they sold to the general public certain articles of food. The testimony of Arnreich is that he had a stall in Lexington Market where he sold fish on every week day; that he, like the other defendants, had such license as the City of Baltimore required; that under the terms of the Baltimore City license he could not sell anything but fresh sea food, fish, oysters and clams; that he bought the articles, which he sold, in the wholesale market, just as they come from the water, and in order to sell them he had to clean them and occasionally he would split a shad down the back, or sell fresh salmon by the pound, after having bought it whole, cleaned it, and cut it into parts; that this also applied to all large fish; that as to oysters, he bought them shucked and sold them in the same condition, by the pint or quart, as desired; that he had owned the stall in the said market for about forty years and never during that time paid a state license fee, and that such a fee was never demanded of him until about Christmas, 1924. George Weil, the appellant in No. 101, testi-

fied that he owned his stall in Lexington Market, which he purchased about five years ago; that he had been in the market for twenty-seven years, but prior to five years ago he owned another stall; that he paid all of the license fees and rent required by the City of Baltimore, amounting to sixty-six dollars a year, and that this license fee and rent had been paid to the city for the year 1924; that he had been conducting a stall in Lexington Market owned by him for twenty-seven years, and during all that time sold veal, and for a short period lamb; that he was engaged in no other line of business at any other place in the state and that he never paid to the State of Maryland, or any officer thereof, acting on behalf of the State, any license fee, and that no such state license fee had ever been demanded of him during the period of twenty-seven years; that he was familiar with what is going on in the market, and that no one conducting a similar business paid the state license fee prior to the year 1924; that he sells veal by the pound, buys carcasses of calves as a whole and cuts them up into pieces; that he buys some of the calves alive, and kills them himself, and others that have been killed; that in both cases he does the carving and cutting up of the veal himself, so as to make it prepared for edible use; that it requires time to learn to cut and carve veal; that he keeps no stock of meat on hand; that he buys carcasses of calves and lambs, which are delivered to him at his stall in the market, and keeps them until sold and then purchases others, that the carcasses are not cut up in different parts when brought to him, but are generally whole. In the case of the appellant George H. Sloatfield, the record discloses that he has owned and operated a stall in Lexington Market for twenty-five years, and, like the other appellants, has paid all the license and rent required by the laws of Baltimore City, and has not paid any to the State of Maryland, nor has any such been demanded of him, prior to 1923; that he buys lambs alive in Baltimore, Chicago and Buffalo, besides which he occasionally buys dressed meats;

he has the lambs killed at the abattoir, employing men there to do this; that he then skins them and prepares them for market with the help of two men who work for him; that such preparation requires some skill; that with the aid of one helper he carves them into such shape as to make them ready for service on the table, and that this also requires training; that he sells no meats to customers except that taken from the carcasses of the lambs, which he brings to Baltimore and butchers, and the dressed meats which he buys in between to keep up his stock, and which are bought from other butchers' stalls and western houses; that he purchases animals on the hoof and never sells them on the hoof; that as a regular business he kills and butchers all these animals; that the value of the stock that he has on hand at any one time does not exceed one hundred dollars. On cross-examination the witness testified that he sold smoked meat and dressed meat; that he buys the meat and does not smoke it himself; some of the dressed meat he kills himself and some he buys from Baltimore dealers and from western dealers.

It is difficult, if not impossible, to define the word "manufacturer," as used in the statute now under consideration; and the courts throughout this country, in construing similar statutes, have given a variety of definitions. This Court, in *Carlin v. Western Assurance Co.,* 57 Md. 523, when construing the provisions of a fire insurance policy on a steam flour mill, fixtures and machinery, determined that it was a manufacturing establishment within the forfeiture clause contained in the policy, which provided: "If it be a manufacturing establishment running in whole or in part over or extra time or running at night, then and in every such case this policy shall become void."

The Court in that case said: "The counsel for appellant contended that making flour from wheat, reasoning from the etymology of the word, and the nature of the process, is not manufacture. But whilst, from its derivation, the primary meaning of the word 'manufacture' is making with the hand, this definition is too narrow for its present use. Its mean-

ing has extended as workmanship and art have advanced; so that now nearly all artificial products of human industry, nearly all such materials as have acquired changed conditions or new and specific combinations, whether from the direct action of the human hand, from chemical processes devised and directed by human skill, or by the employment of machinery, which after all is but a higher form of the simple implements, with which the human hand fashioned its creations in ruder ages, are now commonly designated as 'manufactured.' " The Court then goes on to cite the definition of the phrase "to manufacture" as given by Burrill, Abbott, Webster and Worcester.

In the case of *Carroll County v. Shriver,* 146 Md. 412, we held that a company engaged in canning corn, beans, peas and succotash, and employing for the purpose intricate and expensive machinery, is engaged in manufacturing within the meaning of the Act of 1924, chapter 528, authorizing the county commissioners, by resolution, to exempt from taxation the tools and machinery of those so engaged.

And in the more recent case of *H. M. Rowe & Co. v. State Tax Commission,* 149 Md. 251, where the appellant composed and arranged contents and forms for its books, while the mechanical labor or most of it necessary to produce the finished product was done by others, but by its order and direction, the appellant claimed to be the real producer and the manufacturer, and therefore exempt from taxation under the statute and ordinances; and it was held that the business so operated was not a manufacturing business within the meaning of chapter 528 of the Acts of 1924, and the ordinances of Baltimore City passed in pursuance of said act. The only question presented in that case was whether the business which the appellant claimed was exempt from taxation was a manufacturing business, and the Court, speaking through Judge Offutt, said: "The purpose and intent of such statutes as those under consideration is to augment the wealth and prosperity of the State by inducing the establishment, expansion and development of industries which

will produce by hand or mechanical labor, in commmercial quantities, articles suitable or desirable for the necessities, comfort, convenience or pleasure of the public, afford employment to its own citizens and attract others whose skill and industry will add to its wealth and resources. 'Manufacture' as used in those statutes is a plain word in every day use, and as ordinarily understood means the process of converting some material into a different form adapted to uses to which in its original form it could not be so readily applied. * * * It has an etymological meaning narrower than that, but general and immemorial usage has given it the broader meaning which we have stated. It has been held to describe the process of assembling articles which while complete and finished have no independent utility, but are designed to be used in combination as parts of some other article."

The Court then went on to quote with approval the definition as stated in *Carlin v. Western Assurance Co., supra,* and then added that this definition "is supported by the general weight of authority." *Bouvier's Law Dictionary,* 3; *Words and Phrases,* 2d Series, 279.

The definition as given by lexicographers, or what might be termed "standard definitions," cannot be strictly and safely applied in all cases, because the Legislature, in employing the term as it did in the statute now under consideration, which legislation had for its purpose the exempting of a maker, grower or manufacturer from obtaining a trader's license, in order that he might sell the products so made, grown or manufactured, in addition to having in mind the definition as given by such lexicographers as Webster and Worcester, also had in mind the popular conception of what acts constituted a manufacturing. As applied to a statute such as now under consideration, the definition which is stated in 25 *Cyc.* 520, as being the "legal definition" is more nearly applicable to the case before us. It is there said: "'Manufacture' is: The application to material of labor or skill whereby the original article is changed to a new,

different and useful article, provided the process is of a kind popularly regarded as manufacture."

Applying this definition to the instant case, it will be seen that what the appellants did was not the application to material of labor or skill whereby the original article is changed to a different and useful article, but it remained, after the labor and skill had been applied, the same article, not a different one, to be used for the same purpose, not a different one; and further, that the cutting up or dividing of a carcass of lamb or veal into smaller portions, which may be known as steaks or chops, is not the kind of process which is popularly known and regarded as manufacturing. We, therefore, do not regard the appellants, or either of them, as manufacturers in the sense that would relieve them from the necessity of obtaining a trader's license. The citation of authorities, as stated, as to what does and what does not constitute manufacturing or what does or does not constitute a person a manufacturer, is of little value in determining the instant case, for the reason that all the decided cases have had to do with many different statutes with varying purposes to be accomplished; and, without citing numerous cases which have held *pro* and *con* on this subject, it is sufficient to say that we do not regard the occupation of the appellants, as disclosed by the record, as that of manufacturing.

The third and final contention of the appellants is that the long, uninterrupted and unvarying construction put upon section 42 of article 56 by the administrative officers of the State is entitled to the force of law, and that courts should refrain from putting such an interpretation upon the statute as differs from that applied by the administrative officials, except for the most potent and urgent reasons. We think that this contention is based upon a well settled rule, and that the rule itself is grounded upon sound public policy. It will be seen that the section of the Code under which it is now attempted to compel the appellants to take out a trader's license has been a part of the statute law of the

State for many years, at least more than fifty, and with slight variations, none of which apply to the particular thing before us, for even a longer period of time. The record shows, and it is undisputed, that these appellants have been conducting the kind of business which they now carry on in Lexington Market, in the same manner and in the same place as they do now, for periods ranging from twenty-five to forty years; that they have each promptly paid the rent and license or fees exacted of them by the ordinances of Baltimore City, and that at no time during their conduct of such business has the State or any official thereof demanded of them a trader's license prior to the present case. It is also to be noted that the evidence shows that no other person, of whom there are a great many conducting the business of selling different articles from stalls in the markets of Baltimore City, has ever secured, or been called upon by State officials to secure, traders' licenses for such business. The record does not disclose the reason influencing the administrative officers in adopting the uninterrupted and unvarying construction put upon the section, and the reason which they determined was sufficient for such action is within the realm of speculation. However, a historical investigation of the establishment and growth of the markets of Baltimore City discloses that in the beginning and for many years the market was a place at which the makers or growers of produce for human consumption could take their wares in order to dispose of them conveniently to the public, and it is probable that for many years, and after the statute in question was enacted, the principal if not the exclusive sales made in the market were by growers or makers of the merchandise or articles sold. This custom resulted in a great convenience not only to the sellers of the articles, but to the purchasers, and enabled them to repair to a central place, where they were able to purchase fresh articles of food at a minimum price. This fact may very well have influenced the administrative officers of the State in not requiring that these owners of stalls in the market should take out a traders' license. At

any rate, the long, unvarying and uninterrupted contemporaneous construction put upon this section of the Code by the administrative officers must at this time be given the force of law. It must be presumed that the Legislature during all these years knew that the people engaged in this business were not being required by the administrative officers to secure a trader's license, and that this was the administrative interpretation put upon the section, and, therefore, by acquiescence, the Legislature had approved this administrative construction; for if they had not, it would have been a simple matter to specifically include stall owners in the markets of Baltimore City among those required to obtain this license. It will also be noted that the Legislature, since the establishment of the markets of Baltimore City, and at a time when persons were engaged in the business of selling produce and articles of food in said markets, amended this section without specifically requiring that they should pay the license therein provided for. What is now section 42 of article 56 of the Code was originally enacted by chapter 414 of the Acts of 1858, and subsequently amended by the Acts of 1880, chapter 349; and the Legislature, by making the Code of 1888 not only evidence of the law, but *the* law, again passed on this section and acquiesced in and practically ratified the contemporaneous administrative construction placed uppon the statute, and that at a time when we must presume the Legislature had knowledge of the construction placed upon the statute by the executive or administrative officers of the State, and which construction permitted persons in the position now occupied by the appellants to sell articles of food from stalls in the Baltimore City market without obtaining a traders' license.

This rule of giving effect to contemporaneous administrative construction was early recognized by this Court. In the case of *Hays v. Richardson*, 1 G. & J. 366, the question there was as to whether or not grants and conveyances of *de novo* rent charges, rights of way, etc., should be acknowledged and recorded as deeds conveying land. In that case

our predecessors said (p. 385): "If we entertained even strong doubts as to what originally should have been the construction of this Act of Assembly (of which we have none) they would in a moment be removed by adverting to the single fact which the whole land records of the State will demonstrate, that from the year 1797 to the present date (1829) grants and conveyances of *de novo* rent charges, rights of way, etc., have been as uniformly acknowledged and recorded as deeds conveying the land itself. This contemporaneous unvarying construction of the Act of Assembly for 60 years ought not to be disregarded except upon the most imperious conclusive grounds."

This rule was again applied in *Baltimore City v. Johnson,* 96 Md. 737. The question in that case was whether Baltimore City could assess for the purpose of taxation a seat held by the appellee in the Baltimore Stock Exchange. In the course of that opinion the Court, after calling attention to the fact that prior to that time no attempt had ever been made to assess seats in the exchange, although the exchange had been in existence for more than fifty years, added: "It is not necessarily conclusive of the question, but it is an important circumstance when we remember that the language now relied on is in substance the same that has been in the statutes for so many years. * * * It cannot be assumed that during these many years all the tax officers of the State were in ignorance of the fact that the Baltimore Stock Exchange and other such exchanges were in existence, or that the seats were not taxed. We certainly can assume that all the holders of such seats would not intentionally have violated the law in making up their schedules, and we are equally positive that the tax officers throughout all those years would not have wilfully failed to discharge their duties. * * * And although the members of the Legislature and the city and State tax officers may be presumed to know that these seats have not been assessed, the Legislature has not attempted, in terms, to have them taxed, and, as we have seen, the construction placed on the tax laws during this

great length of time seems to have been that they were not taxable. * * * When, therefore, the language of the statute relied on is not now more comprehensive than it has been for half a century, and the thing sought to be taxed has been in existence during all that time, but has never been taxed, there ought to be some valid and substantial reason assigned before the new construction of the statute now contended for, should be adopted."

The rule was re-affirmed in *Musgrove v. B. & O. R. R.,* 111 Md. 629, in which there was an attempt on the part of the treasurer of Howard County to recover from the railroad company the tax imposed upon interest payable under mortgages executed by the railroad company to a trustee to secure bonds sold to investors. In construing the statutes under which the tax was attempted to be imposed, the Court said, speaking through Judge Pearce, at page 639: "Since 1896, until the institution of this suit, no attempt has been made by any one charged with the execution of the revenue laws of the state, to collect the mortgage tax on bonds of a railroad or other corporation secured by a deed of trust to a trustee, and this contemporaneous construction during a period when the search for new subjects of taxation, and for additional revenue, has been anxiously prosecuted, carries with it great weight. In *State v. Mayhew,* 2 Gill. 497, where the question was of the construction of the Constitution of the State, the Court said: 'A contemporaneous construction of such duration, continually practiced under, and through which innumerable rights of property have been acquired, ought not to be shaken, but upon the ground of manifest error and cogent necessity.' "

To like effect see the cases of *Baltimore v. Machen,* 132 Md. 618; *Hess v. Westminster Savings Bank,* 134 Md. 125; *Burroughs Adding Machine Co. v. State,* 146 Md. 193; *Baltimore v. Pattison,* 136 Md. 64.

We are not unmindful of the limitation upon this rule as expressed in the case of *Smith v. State,* 134 Md. 480, in which it was said: "When the question is presented to it of

a laxity in enforcement, or misconception of the intent of the law by administrative officers whose duty it was to carry out the act of the Legislature, such omission or misconception of clear statutory provisions can not be allowed to stand in the way of giving to the Act of the Legislature the proper interpretation."

This limitation, as thus expressed, is supported by the great weight of authority. In the present case we are of the opinion that there was a reasonable doubt as to the proper interpretation of the statute, and this doubt having been resolved by the executive and administrative officers of the State in favor of the exemption from the requirements to take out traders' licenses by the persons similarly situated as the appellants, and which interpretation has been acted upon and acquiesced in for this great length of time, both by the executive and legislative departments of the State, we would not be justified in giving a contrary interpretation except upon the most cogent and urgent grounds, which we do not find to exist in this case.

From what we have said, it follows that, had the simple question of whether or not the appellants were manufacturers been presented to us, we would hold that they were not manufacturers, but traders; but in view of the long, uninterrupted and continuous construction put upon the statute by those charged with the collection of taxes thereunder, and the acquiescence of the Legislature in such construction, which acquiescence we are bound to presume, we feel constrained to follow the construction thus placed upon the statute and hold that the judgments in these cases should be reversed.

*Judgment reversed.*