The bill alleges that in 1927 complainant bought a parcel of vacant land for $21,000 in the village of South Orange. Of the purchase price, $10,000 was paid in cash and the balance by Briscoe's bond and mortgage for $11,000 to the seller, Ridgewood Company. The mortgage was assigned to Frank A. O'Connor the defendant, who assigned it to the First National Bank of West Orange as collateral security. The mortgage contained a covenant to subordinate it to "the lien of a new first mortgage to be obtained upon said premises, said new first mortgage to be in a sum not to exceed seventy-five (75) per cent. of the cost of the land and building to be erected upon the same." O'Connor and the bank continued to be the holders of the mortgage from April, 1927, to the time the mortgage was cut off by sale under decree in foreclosure advised by Vice-Chancellor Backes in a foreclosure bill in which O'Connor was complainant and in which he sought to foreclose the purchase-money mortgage. See O'Connor v.Arywitz. 112 N.J. Eq. 567. Other allegations are that a building was erected upon the land and the premises before completion and were sold to Boyarsky Gordon, Incorporated, who in turn conveyed to the Lewis Construction Company. The latter secured a mortgage for $70,000 from the Avon Building and Loan Association. About May 5th, 1928, the Lewis Construction Company conveyed the premises to Benjamin Arywitz. The Avon Building and Loan as the holder of the mortgage of $70,000 through an appropriate instrument in writing which was submitted to O'Connor endeavored to procure subordination of the purchase-money mortgage. The defendant refused, and on October 3d 1928, instituted foreclosure proceedings to which the building and loan association filed answer and counter-claim, praying specific performance of the agreement of subordination. O'Connor in the foreclosure suit, according to the reported opinion above, contended that he was not obliged to subordinate; that "unless the `new' mortgage is in form and amount for seventy-five per cent. or less of the cost the covenant is inoperative and this notwithstanding *Page 362 
the building and loan association advanced $70,000 in the belief that it represented seventy-five per cent. and less of the cost of the land and building." This contention did not commend itself to the court, since it was not the intention of the parties, nor the true meaning of the covenant, "the fair interpretation of which is that the lien of a new mortgage shall supersede the complainant's mortgage to the extent of seventy-five per cent. of the cost of the building and land; and as we read it, subordination inheres in the covenant and, graduated to the cost, is spontaneous upon meeting the requirements;" and the court held the building and loan mortgage a prior lien in the amount of seventy-five per cent. of $86,000, namely $64,500. The litigation in that foreclosure was bitterly contested and consumed a period of nearly five years.
The bill alleges O'Connor's resistance was persistent from the beginning; that he moved to strike the answer and counter-claim on numerous grounds and the motion was denied; that he adhered to the position that he was not obliged to subordinate the lien of his mortgage in any amount to that of the Avon Building and Loan Association, and at all times refused to perform the same. It is charged that O'Connor's breach of the covenant occasioned the litigation and the consequent delay, and that except for this the mortgaged premises would have in the ordinary course of foreclosure proceedings been offered for sale and sold at the end of the year 1928 or the early part of 1929, at which time and for a year thereafter there existed a live and active market for the sale of real estate of the kind and description encumbered. The responsibility for the delay, the bill charges, was solely due to the defendant O'Connor.
The premises were eventually in 1933 sold at foreclosure to the complainant building and loan for the sum of $100. Suit is now brought in the Essex county circuit court by the defendant O'Connor to recover the deficiency arising, and the complainant prays that he be enjoined from proceeding with said suit at law.
Complainant predicates his right to injunctive relief upon *Page 363 
the ground that O'Connor was in duty bound to comply with his covenant of subordination, and that his failure to do so resulted in the litigation and delay mentioned, as a result of which the complainant's position was entirely changed, in that the economic conditions arising in the meanwhile occasioned a situation where no bidders attend public sales; mortgage-money was not available and the property in the meanwhile suffered tremendous depreciation in value, all of which conduct on the part of O'Connor, complainant says, was inequitable and unconscionable, and places defendant in the position where he now seeks to benefit by his own wrong.
The matter is before me on a motion to strike the bill of complaint for want of equity, and on order to show cause why a preliminary injunction pending the final hearing should not issue. The motion to strike the bill of complaint is denied. The court will take judicial notice of the prosperous conditions existing in 1928 and the world-wide depression during the past three years. If in 1928 O'Connor had not breached the covenant the premises undoubtedly would have brought sufficient to discharge both mortgages, for the defendant's own value of the premises was $86,000. This cost of $86,000 is the very minimum cost of the land and building embraced by O'Connor's mortgage. That is the figure admitted by O'Connor in the suit in which performance by him of his agreement of subordination was compelled. In that suit the proofs of the counter-claimant, Avon Building and Loan Association, showed a cost of $21,000 for the land and $80,000 for the building, making a total for both of $101,000, and leaving an equity over the first mortgage of $31,000. O'Connor's mortgage was for $11,000. Under any aspect of the foregoing figures there was in 1928 an excess of value (based on cost) over the first mortgage sufficient to have satisfied O'Connor's mortgage in full, without the necessity of falling upon Briscoe, the obligor. Complainant's affidavits of market value in 1928 and 1929 are to the effect that the property then was readily saleable, was worth over $100,000, and at a forced sale would probably have brought $90,000. Such a result in 1928 would not only have satisfied *Page 364 
both mortgages in full but would have left a surplus for the owner of the equity of redemption. The opportunity of such result was effectively blocked and eventually destroyed by O'Connor's effort to retain the position of a first mortgagee, notwithstanding his agreement to the contrary. While endeavoring for years to maintain an untenable position and to escape intoto the obligation of his covenant, the security shrivelled up to the point where its value at the time of the sheriff's sale in 1933 did not extend sufficiently to pay even the first mortgage. The matter of the value of the security must be regarded in the light of conditions in 1928, when O'Connor should have performed and not 1933 when performance was exacted from him by the force and operation of our decree.
"In general it may be stated that in all cases where by accident, or mistake, or fraud, or otherwise a party has an unfair advantage in proceedings in a court of law, which must necessarily make that court an instrument of injustice, and it is therefore against conscience that he should use that advantage, a court of equity will interfere and restrain him from using the advantage which he has thus improperly gained; and it will also generally proceed to administer all the relief which the particular case requires, whether by partial or by a total restraint of such proceedings." 2 Story Eq. Jur. 566 § 1206.
The doctrine of equitable estoppel obtains where there is injury to one party or advantage to the other, resulting from the acts or declarations of the person to be estopped. 21 Corp. Jur.1135. In Seymour v. Goodwin, 68 N.J. Eq. 189; affirmed,69 N.J. Eq. 833, executors were restrained from setting up the legal defense of the short statute of limitations, the court holding that because of their equivocal conduct the executors should be estopped from availing themselves of the statute. By analogy where the principles of estoppel may be invoked to enjoin an inequitable defense, so may they be invoked to enjoin an inequitable cause of action.
"The jurisdiction of a court of equity does not depend upon the mere accident whether the court has, in some previous *Page 365 
case or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind, and the great principles of natural justice, which are recognized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people." Dodge v. Cole, 97 Ill. 338;37 Am. Rep. 111 (at p. 122). And the mere fact that no precedent exists is no sound reason for denying relief when the situation demands and no other principle forbids. Vanderbilt v. Mitchell, 72 N.J. Eq. 910; Earle v. American Sugar Refining Co., 74 N.J. Eq. 751;Palmer v. Palmer, 84 N.J. Eq. 550; Renwick v. Hay, 90 N.J. Eq. 148.
Every just order or rule known to courts of equity was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. New remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief.Toledo, c., Co. v. Pennsylvania Co., 54 Fed. Rep. 746;19 L.R.A. 395 (at p. 399).
Preliminary injunction pending final hearing will issue.