J. BERNARD WELLS, STATE'S ATTORNEY OF
BALTIMORE CITY, *v*. CHARLES P. PRICE

[No. 32, April Term, 1944.]

444

*Decided June 14, 1944.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, and CAPPER, JJ.

*Thomas N. Biddison, Assistant State's Attorney,* for appellant.

*H. Clifton Owens, Assistant City Solicitor,* with whom was *Simon E. Sobeloff, City Solicitor,* on the brief, for appellee.

Brief of *amicus curae* filed by *Abram C. Joseph.*

MELVIN, J., delivered the opinion of the Court.

In these proceedings the State's Attorney of Baltimore City, in his official capacity, is seeking the aid of a court of equity to restrain the Warden of the Baltimore City jail from releasing prisoners in conformity with the State-wide law, rather than with the local law, pertaining to the maximum period of confinement for the non-payment of fines and costs. The former is Chapter 479 of the Acts of 1943, codified as Section 4, Article 38 of the Annotated Code of Maryland 1943 Supp., prescribing three mónths as the maximum period, and the latter is Section 533 of the City Charter (1938 Ed.), prescribing six months. According to the record, the issue would affect the cases of about one thousand prisoners during the course of a year, depending upon the applicability of the general or the local law to the subject of their release.

The case was presented to the Chancellor on bill of complaint, answer and testimony, and resulted in an "Order" dismissing the bill, without an accompanying memorandum or opinion stating the grounds therefor.

The State's Attorney's appeal to this Court is encouraged by the City Solicitor, the appellee's legal advisor,

whose attitude on this point is thus expressed in his answer to the bill of complaint: "The respondent welcomes the filing of the bill of complaint; submits himself to the jurisdiction of the Court, and joins with the complainant in requesting an adjudication which may be appropriately reviewed by the highest court of the State so that the law may be made certain." This is likewise the reason given in appellee's brief for not questioning the right of the State's Attorney to bring this suit, or of the jurisdiction of a court of equity to entertain it. In the language of the brief: "The ordinary conduct of the Baltimore City jail requires an authoritative adjudication of the principal question raised by the case, namely, whether the Act of 1943 or the Charter provision prevails. The appellee trusts that the Court will see fit, in its opinion, to settle this case regardless of technical procedural questions."

However, these two questions are seriously raised on this appeal in the brief filed by a member of the Baltimore Bar, as *amicus curiae,* and must be considered by the Court, for they present the main difficulties in the case. For the reasons hereinafter stated, the members of this Court are unanimously of the opinion that the provisions of the Baltimore City Charter, rather than of the State statute, should govern the decision here, provided these jurisdictional difficulties can be overcome.

First, what right has the State's Attorney to bring this kind of a suit? While it has been expressly decided by this Court that he possesses no other powers than those prescribed by the Constitution or by statute (*Hawkins v. State,* 81 Md. 306, 310, 32 A. 278), nowhere are these powers enumerated or defined. All that the Constitution says on the subject is that "The State's Attorney shall perform such duties * * * as are now or may hereafter be prescribed by law." Const., Art. 5, Sec. 9. An examination of the statutes shows no mention at all of either the powers or the duties of this official, nor is there any precedent laid down by this Court by way of interpretation of his rights, powers or duties in a case

of this nature. The law is silent as to his authority to appear on behalf of the State and commence, prosecute or defend a cause in which the State, as a body politic, has a special interest, as in the case at bar.

The allegations of the bill of complaint are, in substance, that the release of prisoners under the State-wide statute, instead of the Baltimore City Charter, would amount to a continuing violation of law, would be contrary to public interest, and could only be remedied through an injunction restraining the Warden from following the wrong statute.

These allegations are not disputed by the answer to the bill of complaint, the sole issue on the pleadings being the construction of statutes, and the only testimony in the record is that of the Warden himself. The pertinent parts of his testimony are: that he has been connected with the Baltimore City jail for nineteen years and has held the position of Warden for nine years; that he is familiar with the administrative practice concerning the discharge of prisoners committed there in default of fines and costs during that time; that up to the present controversy "the Baltimore City jail has always followed Section 533 of the Baltimore City Charter"; that if the State's Attorney had not taken the present action in Court the jail would have been following the public general law of 1943 (this to conform to a recent ruling of one of the Judges of the Supreme Bench of Baltimore City in the *habeas corpus* case mentioned in the bill of complaint,—Poehlman) ; that according to the City Solicitor's advice, in view of the present Court proceedings the jail is continuing to operate under Section 533 of the City Charter, except in specific cases where the Judge would order otherwise; that in the course of a year more than one thousand prisoners would be affected by the difference between the operations under the one or the other of the two conflicting statutes.

The witness' testimony concludes with these sentences: "That there have been questions raised as to which of the Acts controls prior to the passage of the Act of 1943.

448

It has been raised in four or five proceedings, cases of *habeas corpus* since the last ten years, and in each case the Judge ruled that Section 533 of the Baltimore City Charter prevailed." In this connection the record also contains a reference to a letter dated November 17, 1943, from an Assistant City Solicitor to the Warden (appellee), advising that "no legislation was passed at the 1943 session of the General Assembly which would affect the provisions of the Baltimore City Charter." The present controversy, therefore, results directly from the ruling to the contrary in the *habeas corpus* case of Poehlman, above mentioned, rendered in the Baltimore City Court on February 11, 1944.

The aforegoing is substantially the case as it comes before this Court. Not only is the authority of the State's Attorney to bring this suit unquestioned by the parties to it but, because of their concurrence in the procedure for testing the point in controversy, they have offered no authority or precedent in law on any jurisdictional question. The only authorities mentioned in the brief of *amicus curiae* on his point of "May a Maryland State's Attorney, as such, institute a proceeding of this character", are neither relevant nor helpful here.

The first authority cited is *Hawkins v. State,* 81 Md. 306, 32 A. 278. That case went no further in this connection than to decide, in effect, that a State's Attorney has no authority to institute proceedings in the nature of a *quo warranto* to oust an incumbent from a public office, and that he possesses no other powers than those prescribed by the Constitution or by statute, without pretending to define them. The other authority cited is that of *Mayor, etc., of Baltimore v. Gill,* 31 Md. 375, 385, which has nothing to do at all with the office of State's Attorney. The mention of the Attorney General in the opinion is simply to the effect that the bringing of that particular suit (injunction to restrain the collection of taxes under an unconstitutional ordinance) did not come within the duties of the Attorney General and that he was not a necessary party to it.

In brief, no authority has been cited, nor has any been found, that would deny the State's Attorney the right to initiate this kind of a proceeding in the discharge of his official duties. If the issue be not raised by him it would necessarly, under the facts and circumstances prevailing here, have to remain unsettled,—at least, until the next session of the General Assembly—and a situation would result in which hundreds of prisoners would be released every year contrary to the law. To permit such a situation to continue without allowing the State the right to even challenge it would amount to a confession of complete impotency in the administration of our system of criminal law which the Court does not feel justified in making.

Inherent in the office of State's Attorney are certain obligations to the public and to the criminal court which the incumbent is as fully bound to discharge as he is to perform his routine duties as prosecutor. He not only represents the State in the realm of law enforcement, but is also in a very special sense an officer of the court in which he serves, so that in this dual capacity he has, impliedly, both the right and the duty to help give effect to the law and the judgments under it as pronounced by the Court.

His obligations as a public official representing these two related interests,—the State and the Court,—are not to be considered as fulfilled in a given case when the trial of it comes to an end and the defendant is sentenced. The sentence remains to be carried out, and carried out, moreover, in accordance with the particular law for such a case made and provided. If the public functionary to whose charge the defendant is committed (in the instant case the warden of the Baltimore City jail) should for any reason not follow this law but should mistakenly follow another, under which not only a particular prisoner would be prematurely released but hundreds of others likewise during the course of a year, the judgment of the court, as well as the operation of the applicable statute, would be thwarted. That is precisely

the situation which confronted the appellant here, and as above indicated, it was both his right and his duty to take action to prevent this miscarriage of the law, especially as under our judicial system there is no one else in a position to do so.

Whether or not the particular form of action adopted for raising the main issue is an appropriate one, presents the next jurisdictional question, namely: Is this a case for the granting of relief in equity? Here, again, no authority or precedent has been cited by either of the parties to this suit, for they concurred in the matter of procedure and in asking this Court to review and determine the point in controversy, "regardless of technical procedural questions." Moreover, the authorities on this point cited in the brief of *amicus curiae* are in no respect decisive of the issue here.

In pursuing the inquiry as to the Court's jurisdiction in the premises it is of first importance to keep in mind the distinction between the term "jurisdiction" in its strict meaning, i.e., the power of the Court to hear and determine a cause, and as generally used in equity jurisprudence, i.e., the exercise of this power in a particular case. As stated by Judge Offutt in *Fook's Ex'rs v Ghingher,* 172 Md. 612, at page 621, 192 A. 782, at page 786: "The term 'jurisdiction', as used in defining the powers of courts of equity, has a different and narrower meaning than that ordinarily given to it, because of the peculiar nature of those courts and its use in contradistinction to 'jurisdiction' in general and 'common law' jurisdiction in particular. *Pomeroy Equity Jr.,* Sec. 129, *Hunt v. Hunt,* 72 N.Y. 217, 228-230, 28 Am.Rep. 129." See, also, 30 *C. J. S., Equity,* Sec. 9, p. 327.

As further stated in *Pomeroy Eq. Jur.,* Sec. 129: "The proceedings and judgment of a court of chancery, or of a court clothed with equity powers, are not necessarily null and void because the action is not one which comes within the scope of 'equity jurisdiction' in the common acceptation of that phrase, or, in other words, because the claim is one for which there is a full, ade-

quate and complete remedy at law * * *. At the same time, if a court clothed with equity jurisdiction should hear and decide according to equitable methods a case which did not fall within the scope of the equity jurisprudence, because both the primary right invaded constituting the cause of action and the remedy granted were wholly legal, and belonging properly to the domain of the law courts, such judgment, however erroneous it might be and liable to reversal, would not necessarily be null and void. On the contrary, as will be more fully stated hereafter, the objection that the cause does not come within this so-called equity jurisdiction must ordinarily be definitely raised by the defendant at the commencement of the proceeding, or else it will be regarded as waived and the judgment will not even be erroneous." *Fooks' Ex'rs v. Ghingher, supra.*

Therefore, while it is of primary importance in passing upon this case to consider the definition of terms and the distinction between them, it is apparent from the record that the Chancellor was fully justified, under the circumstances, in entertaining jurisdiction of it. Not only was this jurisdiction unchallenged at any stage of the proceedings before him, but the circumstances and exigencies of the case combined to support the exercise of his discretion to hear and determine the cause.

This position is further strengthened by a consideration of the consequences involved in granting or withholding equitable relief here. The general rule of law on this phase of the case is thus expressed by Mr. Justice Stone in *Di Giovanni v. Camden Fire Ins. Ass'n,* 296 U.S. 64, 80 L.Ed. 47, 53: "While the consequences of the court's grant of equitable relief cannot affect its power, they nevertheless have an important bearing on the exercise of the judicial discretion which must guide a court of equity in determining whether it should grant or withhold a remedy which it is within its power to give. Its discretion may properly be influenced by considerations of the public interests involved."

Viewing the consequences of granting or withholding equitable relief in the instant case, and giving due consideration to the public interests involved, it is obvious that, on this ground alone the Chancellor had sound reason for entertaining jurisdiction. The bill of complaint here is not dealing with the cases of any particular individuals, but is directed solely to preventing the release from day to day of an undeterminable number of prisoners, amounting in the course of a year to something like a wholesale jail delivery, and due directly to the illegal procedure of a public functionary acting under mistaken legal advice. That equity will interpose by injunction to arrest such a course is indicated in the case of *Mayor, etc., of Baltimore v. Porter*, 18 Md. 284, 302, 79 Am.Dec. 686, in which further citation of authorities is given.

Even the absence of precedent in this particular kind of a case would be no bar to the exercise of the jurisdiction of a court of equity and to the award of relief, for equity principles are broad and comprehensive and their application is not to be denied merely because of a new subject. *McDougall v. Huntingdon, etc., Co.,* 294 Pa. 108, 143 A. 574. Or, as stated in *Briscoe v. O'Connor,* 115 N.J.Eq. 360, 170 A. 884: "Mere absence of precedent does not preclude equity court from granting relief required by circumstances." This is in accordance with the maxim that "equity suffers no right to be without a remedy," and is supported by the authorities generally. *McGee v. City of Los Angeles,* 6 Cal. 2d 390, 57 P. 2d 925, 927; *Rice v. Van Vranken,* 132 Misc. 82, 229 N.Y.S. 32, 37, 38, affirmed 225 App.Div. 179, 232 N.Y.S. 506, affirmed 255 N.Y. 541, 175 N.E. 304; *Grand International Brotherhood of Locomotive Engineers v. Mills,* 43 Ariz. 379, 31 P. 2d 971; *Norman, Inc., v. Holman,* 105 Colo. 294, 97 P. 2d 739; *Teachers' Retirement Fund Ass'n of School Dist. No. 1, Multnomah County v. Pirie,* 150 Or. 435, 46 P. 2d 105; 30 C.J.S., Equity, Sec. 12, pages 331, 332.

Still further support for the exercise of jurisdiction in this kind of a case is to be found in the application of the principle that equity will act to prevent multiplicity of litigation. *Pomeroy Eq. Jur.* (5th Ed.), Vol. 1, 462. "In fact", states this eminent authority, "the 'multiplicity of suits' which is to be prevented constitutes the very inadequacy of legal methods and remedies which calls the concurrent jurisdiction into being under such circumstances, and authorizes it to adjudicate upon purely legal rights, and confer purely legal reliefs. On the other hand, the prevention of a multiplicity of suits is the occasion for the exercise of the exclusive jurisdiction. The multiplicity of suits to be avoided, which are generally actions at law, shows that the legal remedies are inadequate, and cannot meet the ends of justice, and therefore, a court of equity interferes, and although the primary rights and interests of the parties are legal in their nature, it takes cognizance of them, and awards some specific equitable remedy, which gives, perhaps in one proceeding, more substantial relief than could be obtained in numerous actions at law. This is the true theory of the doctrine in its application to the two jurisdictions."

While individual cases arising out of the factual situation before us might well be dealt with through *habeas corpus* proceedings, such procedure could go no further than to determine the rights of each relator or petitioner, thus not only giving rise to a multiplicity of suits, but, at the same time, leaving the main legal problem unsettled and the public interests unserved and unprotected. In such a situation the exercise of equity jurisdiction is fully justified, for in no other way could this relief be afforded.

It is apparent, therefore, that in so far as the jurisdictional issues in the case at bar are concerned, there is no ground for dismissing the bill of complaint.

This brings us to the substantive issue in the case, the decision of which by this Court is the avowed object of both parties in joining in the present appeal. The

issue is whether or not Section 533 of the Baltimore City Charter, prescribing six months as the maximum period of imprisonment for the nonpayment of fines and costs, was repealed by Chapter 479 of the Acts of 1943, prescribing three months as the maximum period.

While the Chancellor did not file an opinion or memorandum with his order dismissing the bill of complaint, it is to be assumed that he adopted the views expressed by the trial judge in the Poehlman *habeas corpus* case, and whose opinion is set forth as an exhibit in the record before us. The conclusion there was that the repeal in question was accomplished and that, consequently, the charter provision is no longer operative. With this conclusion we cannot agree, for it is unsupported by both the common-law rule that a local statute shall not be held repealed except by clearly indicated purpose on the part of the legislature (*Alexander v. Mayor, etc., of Baltimore,* 53 Md. 100, 104; *State v. Falkenham,* 73 Md. 463, 21 A. 370) ; and by the fundamental rule of statutory construction that, in determining the legislative intent, the presumption is against repeal by implication. *Garrett v. Janes,* 65 Md. 260, 3 A. 597; *Green v. State,* 170 Md. 134, 183 A. 256; *Baltimore City v. Davis,* 120 Md. 403, 87 A. 690; *Lewis v. Gsell et al.,* 183 Md. 123, 36 A. 2d 702.

The Act of 1943 (Chapter 479) which is a public general law, does not mention the subject of repeal of the city charter or any provision of it, directly or indirectly, nor is there even a so-called "blanket" repealing clause such as is usually found when a new scheme of laws is contemplated as a substitute for pre-existing statutes, general and local.

The Act in question is not a new law at all but, on the contrary, is nothing more than another amendment of a State-wide law which was first enacted in 1874 and which had been amended or codified as many as six times prior to 1943. Specifically, after its enactment as Chapter 59 of the Acts of 1874, it was codified as Section 3 of Article 38 of the Code of 1888, was amended by Chapter 87 of the Acts of 1898, and was embodied in each suc-

ceeding code of Public General Laws—1904, 1912, 1924 and 1939—as a section of Article 38, title "Fines and Forfeitures." In every instance the opening sentence of the statute contains the same words, which are of special significance in the case at bar, namely: "Any person who shall or may hereafter be committed to jail on any charge, including contempt of court, by the judgment of any court of justice or by any justice of the peace of this State", etc.

Taken literally, these words of the original act and subsequent amendments would include the courts and justices of the peace of Baltimore City as well as of the counties, but the fact is that for some sixty-nine years the generally accepted construction throughout Maryland has been to the contrary. Baltimore City all that time has had a Charter provision of its own on the subject which the legislature not only showed no intention to disturb but consistently recognized as being operative within that jurisdiction.

Then came the amendment of 1943 (Chapter 479) entitled "An Act to repeal and re-enact, with amendments, Section 4 of Article 38 of the Annotated Code of Maryland (1939 Edition), title 'Fines and Forfeitures', relating to imprisonment for the non-payment of fines and costs." This Section 4, as amended, starts off with the same language used in all of the preceding enactments, including the words "by the judgment of any court (of justice) or by any Justice of the Peace of this State * * *." The only substantial change which this amendment made in the old law was to reduce the maximum period of confinement from six months to ninety days. It had no more reference to Baltimore City than had the original statute, and is not susceptible now of an interpretation that would suddenly ascribe a different and directly contrary legislative intent. The rule of law applicable here is thus expressed in *Humphreys v. Walls*, 169 Md. 292, 181 A. 735, 738: "While the construction of a statute or constitutional provision is a judicial function, courts may, in declaring their meaning and effect,

avail themselves of the construction put upon them by the Legislature by long-continued custom and acquiescence. As said by this court, in an opinion by Chief Judge McSherry in *Trustees of Catholic Cathedral v. Manning*, 72 Md. 116, 130, 19 A. 599, 603, 'A contemporaneous construction placed upon a particular provision of the organic law by the legislative department of the government, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period down * * * furnishes a very strong presumption that the intention is rightly interpreted,' *State v. Mayhew*, 2 Gill 487; *Levin v. Hewes*, 118 Md. 624, 641, 86 A. 233, 239."

To the same effect is the statement of the rule in *Graham v. Joyce* 151 Md. 298, 306, 134 A. 332, 335: "An unvarying practical construction of a statute for a long period of time must, of course, have a strong persuasive influence upon the judicial construction of it, insofar as it is open to construction, and 'ought not to be disregarded but upon the most imperious grounds.' *Hess v. Westminster Savings Bank*, 134 Md. 125, 106 A. 263; *Burroughs Adding Mach. Co. v. State*, 146 Md. 192, 126 A. 127."

In addition to the legislative construction given this statute, namely, that it was never intended to apply to Baltimore City, the record shows that this same construction was put upon it by the administrative official charged with its operation (the Warden of the Baltimore City jail, the appellee here) who, for at least nineteen years followed the local Charter provision, notwithstanding the fact that this State law on the subject (Article 38) was then in the Code. In this connection the record goes even further than indicating legislative and administrative construction and shows, affirmatively, judicial interpretation to the same effect. The appellee, himself, testified that the courts of Baltimore City have in "four or five proceedings", prior to the Act of 1943, ruled that the Charter provision (Section 533) was not repealed by any of the successive amendments to the

general law. Added to this testimony is a letter, as an exhibit in the case, to the appellee from an assistant city solicitor only last November, officially advising him, in substance that there was no repeal by this latest amendment (Chapter 479, Acts of 1943).

In this state of facts, the law on the point now under consideration is free from doubt, as this Court has already declared in clear language that the long uninterrupted and unvarying construction put upon a statute by administrative officials is entitled to great weight in law, and that courts should refrain from putting a different interpretation upon the statute except for the most potent and urgent reasons. *Arnreich v. State*, 150 Md. 91, 101, 132 A. 430; *Americun-Stewart Distillery Co. v. Stewart Distilling Co.*, 168 Md. 212, 177 A. 473.

In construing this statute in the light of its own history, the issue of legislative intent is still further clarified by comparing it with that of the Baltimore City Charter provision on the same subject. This had its origin as far back as 1860, when it was codified as Section 234 of Article 4 of the Public Local Laws, title "Fines and Forfeitures." This prescribed six months as the maximum period of imprisonment for nonpayment of fines and costs and that prescribed period has remained in the City Charter ever since. Subsequent to its enactment in 1860, this section was codified as Section 310 of Article 4, of the Public Local Laws of 1888, was reaffirmed for the City of Baltimore by the General Assembly in 1898 through the enactment of Chapter 123, Section 443,—at which session, most significantly, the State-wide law on this same subject (imprisonment for nonpayment of fines and costs, Article 38),—was repealed and re-enacted, thus leaving the general law and the city charter provision co-existing. Then, again, the Acts of 1908 (Chapter 18), in dealing with this section, left the maximum period of imprisonment at six months, and that Act was codified as Section 443 of the City Charter. In 1916, c. 646, the subject was once more dealt with by the legislature by adding to Article 4, Section 443 the

words: "And provided further that if and when said fine and costs shall be paid, one dollar shall be deducted from the same for each full day served in jail." As thus revised, the section was codified in the 1927 City Charter, and finally became Section 533 of the present City Charter (1938 Edition).

These references to the history of the respective statutes,—that is the City Charter provision and the General Law relating to "Fines and Forfeitures", show most clearly an intent and purpose on the part of the legislature to allow Baltimore City to follow its own prescribed rule for dealing with this subject. The City's status as a political unit, separate and distinct from other subdivisions of the State, has long been recognized in matters of legislation and the trend has been more and more toward home rule and a minimum of interference with its own internal government. The situation described in the record in the case at bar is but one illustration of this attitude, which reached its most direct expression in connection with the home rule amendment to the State Constitution which was passed by the Legislature in 1914 and ratified by the people at the polls in the general election of 1915.

The Charter adopted by the City of Baltimore in pursuance of that amendment, taken in connection with Sections 3 and 4 of the latter, Article XIA, was generally accepted as a long step away from direct participation by the State Legislature in the matter of laws governing the municipality. As expressed in the language of the Charter Board, of which the late Judge Henry D. Harlan was Chairman, in its report to the Mayor of Baltimore City in 1918: "It is believed that the large majority with which the people of Baltimore ratified the constitutional amendment for home rule in 1915, and voted for the creation of a charter Board in 1917, is a guarantee that the people of this city have awakened to the importance of having control over their own government, * * *."

That the legislative department of the State likewise interpreted this ratification of the home rule amendment and the adoption of a City Charter in pursuance thereof, is to be inferred from the manner in which it has dealt with this very subject of fines and forfeitures. Long before the date of the home rule amendment, in fact since 1860, the City has been operating under its own law dealing with this subject of imprisonment for nonpayment of fines and costs; since 1874 the State, outside of Baltimore City, has been operating under a general law dealing with the identical subject, and they have been generally accepted as coexisting. The legislature in succeeding years passed one law after another amending or codifying both of these statutes,—the local and the general,—and did so both before and after the adoption of the home rule amendment. It is inconceivable that, without any apparent reason whatever, the Legislature should, at its session of 1943, suddenly depart from its long established interpretation of these particular statutes and go completely contrary to the spirit of the home rule amendment which it had proposed in 1914.

Such a situation as confronted the Legislature in 1943 called with unusual emphasis for a clear indication of purpose if the amendment to the State law (Chapter 479) was designed to repeal the local law which had been in effect for some eighty-four years, and which had always been construed as coexisting with this State law since its enactment in 1874. The Legislature's failure to make such a manifestation of purpose or intent by referring in any way to the Charter provision brings the case squarely within the common-law rule that "local or special laws shall not be held repealed except by clearly indicated purpose on the part of the Legislature." *Alexander v. Mayor, etc., of Baltimore*, 53 Md. 100, 104; *State v. Falkenham*, 73 Md. 463, 21 A. 370.

Both the appellee and the trial judge in the *habeas corpus* case have cited with much reliance the Falkenham case, supra, as authority for their conclusion that the local law in the instant case must yield to the State-

wide statute. The legislative intent to effect a repeal is manifest, they maintain. However, a consideration of the facts of that case and the law as laid down by the Court only serves to indicate and emphasize the very opposite conclusion.

There the Legislature was dealing with an entirely new general law on the subject of cruelty to animals and made applicable to the whole State. By a single statute the Legislature adopted a whole system of laws which, the Court held, manifested an intention to substitute this for the pre-existing laws, general and local, on the same subject. The basis of the opinion is summarized by this passage, quoting from *Alexander v. Mayor, etc., of Baltimore, supra:* "If the intention of the Legislature in the passage of later laws, by its language clearly indicates, either expressly or by necessary implication, a purpose to substitute a new scheme of laws for the pre-existing law, general and local, or to repeal the local by the adoption of a new general law, clearly intended to operate equally throughout the State, the local law must yield to that intention thus ascertained. As respects the general and local laws adopted by the Court, it declares the intention to be, that the local law shall have precedence. As respects subsequent legislation, the rule becomes but the declaration of the common law rule, that local laws or special laws shall not be held repealed except by clearly indicated purpose on the part of the Legislature."

The Court was there interpreting the application of Article 1, Section 10 (now Section 13) of the Code, which declares that: "Where the public general law and the public local law of any county, city, town or district are in conflict, the public local law shall prevail." The intention of the legislature, as ascertained by the Court, is, after all, the controlling factor in every case.

The very vital distinction between that case and the one at bar is that here, in 1943, the Legislature was obviously not dealing with an "entrely new and comprehensive law" but, on the contrary, was dealing with one that had been on the statute books for approximately

seventy years and in operation all that time contemporaneously with the local law for Baltimore City, both of which had been amended several times since their first enactment. Moreover, the very words of the 1943 statute, which are now invoked as affecting the alleged repeal, namely, "by the judgment of any court or by any Justice of the Peace of this State", have been embodied in the statute from the beginning and in all the enactments. The lack of legislative intent to do, in 1943, what admittedly was not done, or intended, by any of the previous amendments of this same general law, namely, to repeal the Charter provision, is too obvious to require further comment.

Strong reliance is also placed by the appellee, and by the Court in its opinion in the *habeas corpus* case, on the point that the Legislature at this same session in 1943 by the enactment of Chapter 1007 expressly made State-wide in its application the provision that a commitment for a fine imposed under the motor vehicle laws should be limited to a maximum of three months. It is maintained that the Legislature could hardly have intended to put a State-wide maximum of three months for commitment under the motor vehicle laws and allow a maximum of six months for commitment under other laws.

Here, again, the lack of legislative intent to effect a repeal of the Charter provision in the case at bar is strikingly emphasized by the comparison thus invoked. Every element prescribed by the Court in the Falkenham case, supra, as the basis for the repeal of any and all pre-existing statutes, general and local, is present in Chapter 1007 of the Acts of 1943, just as in the other Act of 1943 (Chapter 479) there is no such element.

For instance, in the former, which is a voluminous statute of 135 printed pages, the title expressly states that it is an act to repeal the whole sub-title "Motor Vehicles" and all amendments thereof "and to enact in lieu thereof a new Article * * * revising generally the Motor Vehicle Laws of Maryland." The very first paragraph of Section 2 is: "Applicability: The provisions of this Article are intended to be State-wide in their effect, and except

to the extent that they may be specifically authorized by any other provisions of this article, no City, County or other Municipal subdivision of the State shall have the right to make or enforce any local law, ordinance or regulation upon any subject for which provision is made in this Article." The Section then goes on to still further emphasize its State-wide applicability by stating "the provisions of this Article (except as herein otherwise specifically provided) are intended to be exclusive of all local and municipal legislation or regulations, upon the very subjects with which this Article purports to deal, and all Public Local Laws, Ordinances and Regulations inconsistent or identical therewith or equivalent thereto, are hereby repealed; and the charters of all Municipal Corporations of this State are modified so as to prohibit such corporations from making or enforcing any ordinances or regulations in violation of this Article."

To emphasize even further its State-wide applicability and its purpose to substitute this entirely new scheme of laws for all pre-existing laws on this subject, general or local, a concluding section (3) adds: "That all laws or parts of laws of the State of Maryland, General or Local, enacted prior to the General Session, of the General Assembly of Maryland, 1943, inconsistent with the provisions of this Article, be and the same are hereby repealed to the extent of such inconsistency."

It is difficult to conceive a more striking differentiation in the matter of legislative intent than that to be found in the comparison of this statute, so strongly worded on this phase of it, with the particular statute involved in the case at bar (Chapter 479) and passed by this same body of legislators at the same session. This latter statute, which covers but half of a printed page, simply recites that it is an act to repeal and re-enact a single section of a general law relating to imprisonment for nonpayment of fines and costs. This law, incidentally, as hereinbefore stated, is one that had been on the statute books since 1874. No reference at all is made to the subject of repeal, just as none had been made in the

preceding amendments to this same statute enacted at a time when the provision of the Baltimore City Charter on this subject was still in force. Also, it is to be noted that the Baltimore City Charter contained no provision relating to the motor vehicle law (except the irrelevant section pertaining to the sale of unclaimed cars), so that when the Legislature proceeded to establish an entirely new and comprehensive system for the whole State it was not faced with a local law on the subject in Baltimore City, as it was when it dealt with the subject of fines and forfeitures.

Without prolonging this opinion, it is sufficient to say that if the Legislature had intended this statute to operate as a repeal of the old provision of the Baltimore City Charter it pointedly failed to indicate any such purpose or intention. Under the circumstances, we must hold that the presumption against a repeal by implication has not been overcome and that, consequently, Section 533 of the Baltimore City Charter remains in full force and effect.

*Order reversed, and cause remanded for the passage of a decree in conformity with the views expressed in this opinion. Costs to be paid by the appellee.*