## William P. Innes v. David Stewart and another.

*Foreclosures: Deficiency: Proceedings at law: Leave of court.* Under the statute (*Comp. L. 1871, § 5149*) leave of the court where the foreclosure was had, is essential to justify proceedings at law to recover a deficiency on a mortgage foreclosure in chancery.

*Personal decree: Service: Appearance: Publication.* A personal decree cannot lawfully be rendered against a defendant brought in by publication, but who has not been served with process or appeared in the cause.

*Foreclosure sales: Deficiency: Interference to prevent fair sale: Estoppel.* The interference by parties interested in a chancery foreclosure sale to prevent a fair and usual sale to the highest bidder, as by making arrangements with persons who intended to bid at the sale to protect their interests, whereby they were deterred from bidding, is enough of itself to estop them from claiming a deficiency on the sale, which they have been the means of creating; and their action at law for an alleged deficiency so created will be enjoined in equity.

*Heard April 5. Decided April 18.*

Appeal in Chancery from Kent Circuit.

*J. A. Rogers, T. B. Church* and *Norris & Uhl,* for complainant.

*Taggart, Simonds & Fletcher,* for defendants.

CAMPBELL, J:

Innes filed his bill to restrain a suit on a bond for an

alleged deficiency after a mortgage foreclosure, the sale having been made in April and confirmed in June, 1864, and the suit complained of having been begun in 1874. The bill claims the debt was paid by the sale, and also that whether technically paid or not, the circumstances were such as to operate the same result, by the interference of interested parties in preventing bidders from appearing.

No leave was granted by the circuit court of Kent county, where the foreclosure was had, to sue on the bond, which was necessary to justify such action.—*C. L.*, § *5149; Joslin v. Millspaugh, 27 Mich. R., 517.*

Innes made two purchase money mortgages for four thousand dollars each in May, 1854, to John Ball and Ransom E. Wood, payable in ten years. One of these came into the hands of Newton Carter, who began a foreclosure in March, 1863, and got a decree in February, 1864, under which sale was made to John Ball as aforesaid for about sixteen hundred dollars. The other was foreclosed at the same time in the name of one Alexander, and bid in by Ball for a smaller sum. Immediately after Ball received his deed, and on the next day, June 4, 1864, Ball conveyed to David Stewart the whole property purchased on both foreclosures, for the amounts due on the decrees for principal, interest and costs, amounting to about ten thousand dollars, at the same time transferring the whole securities, or intending such transfer.

Innes was not served with process, but brought in by publication. As he never appeared, there could be no personal judgment against him, and no attempt was made to obtain any order of execution for the deficiency. The decrees were shaped, in regard to the order of sale of the various parcels, by stipulations of certain of the parties defendant who had purchased lots, and the sale was made in that agreed order.

It is now claimed that the sale was in fact conducted under an arrangement whereby David Stewart was to get the title, and that persons who would otherwise have bid

were induced not to do so by private arrangements for their protection which were subsequently carried out.

After purchasing the land, Innes sold out to William H. Stewart, and one Ives, who in December, 1857, conveyed his share to his co-tenant, who thus took the whole title. The land, which was near Grand Rapids, consisted of about 400 acres, divided and intended to be divided into lots.

Innes gave Stewart and Ives a bond of indemnity against the Wood and Ball mortgages. They paid him three thousand dollars and gave him a mortgage for sixteen thousand five hundred dollars for the balance of the purchase money. This mortgage, dated in October, 1856, was assigned by Innes to Harvey P. Yale, in June, 1857.

Yale made releases of lots from time to time as Stewart sold, under an arrangement with Stewart whereby the proceeds of sales were to be used towards paying off the Ball and Wood mortgages, and these transactions continued up to the sale. About the time when the foreclosure decrees were rendered, Yale and William H. Stewart made an agreement whereby Stewart was to negotiate for means to pay off the decrees, and they were to divide the surplus;—Yale reserving the right to grant land necessary for the track of the *Detroit & Milwaukee Railway.*

Here begins some conflict and confusion of testimony. It appears that Wm. H. Stewart made some arrangement with David to procure the money. He says he proposed to David to raise a part, and that the balance would be contributed by the purchasers of lots. There *is* no question but what the decrees were intended to be canceled in this way. David, who in some important respects does not tell the same story as William, says that William got a friend to raise two thousand five hundred dollars, and that David raised the same amount and brought the five thousand dollars to Michigan to carry out the plan, but that when he came here his brother reported the rest could not agree, and so the matter fell through; and that after the sale he bought out Ball on his own account.

INNES *v.* STEWART.

Without going into detail, we think these facts are apparent. The whole plan was under the guidance and procurement of William Stewart, who had agreed to do what he could to get the decrees settled. He dissuaded the purchasers in some instances, and probably in many, from bidding at the sale, by promises to have their rights protected, which were afterwards carried out by David. The sale to Ball for less than a quarter of the price he immediately received from David Stewart is evidence enough of some peculiar influence attending the transactions. We cannot come to any other conclusion than that means were designedly used to prevent a sale under the usual competition, and that the property which David came out to redeem and then purchased for the whole amount of the decrees, would never have been sold to Mr. Ball at a nominal price unless means had been used to secure such arrangements as would enable David to be sure of obtaining it. And in this whole matter David and William are shown to be practically one. The subsequent dealings are as plain as the earlier ones.

There is no doubt William Stewart was bound to clear off the decrees. Whether this obligation was due to Innes or not, is not clearly shown,—although the part played by the sixteen thousand five hundred dollar mortgage seems to indicate a connection between that and the bond of indemnity. This is not definitely established. But the interference to prevent a fair and usual sale to the highest bidder is enough of itself to estop the parties from claiming a deficiency which they have been the means of creating.

We think, therefore, that this suit brought ten years after these arrangements, and never authorized by the proper court, is not a fair suit, and is meant to enforce a liability which the parties are estopped from asserting.

The decree below, which was in favor of Innes, should be affirmed, with costs.

The other Justices concurred.