The bill of complaint is brought to enjoin the defendants from prosecuting a deficiency suit at law.
This cause was before the court heretofore on complainant's application for a preliminary injunction. The facts essential to the allowance of such preliminary relief were established by affidavits and are set forth with some detail in the court's opinion. 115 N.J. Eq. 360. Those facts, together with additional facts, have now been established at final hearing by oral testimony and exhibits to a degree that leaves no doubt concerning the complainant's right to relief. It is not necessary to restate such of the facts as appear in the court's earlier opinion. It is deemed sufficient to point out the new and additional facts that were proved.
The controversy resolved itself on final hearing into two questions, viz., (a) whether upon the uncontroverted facts complainant was equitably entitled to the relief sought, and (b) whether the right to such relief was lost by complainant's participation in the foreclosure suit of O'Connor v. *Page 323 Arywitz, decided by Vice-Chancellor Backes, 112 N.J. Eq. 567.
Defendant O'Connor's counsel assumed the position that there was but one factual issue in the case, and that related to the alleged aid and co-operation which complainant, Briscoe, furnished to O'Connor in the foreclosure suit (O'Connor v.Arywitz, supra), where was litigated O'Connor's duty to perform a covenant of subordination, to subordinate his mortgage to "the lien of a new first mortgage to be obtained upon said premises, said new first mortgage to be in a sum not to exceed seventy-five (75) per cent. of the cost of the land and building to be erected upon the same." The record in that suit was offered and received in evidence over the objection of defendants' counsel that it was irrelevant and incompetent except only as to certain petitions and orders which constituted part of the record and which were not specified. The record was received subject to such specific objections as counsel would make before the conclusion of the hearing, the court stating that upon such objections being made it would rule thereon. No objection was thereafter made by counsel to any part of the record; on the contrary, counsel relied heavily on portions of the record and particularly on the finding by Vice-Chancellor Backes that O'Connor was justified in his refusal to subordinate the lien of his mortgage to the extent of $70,000, the principal of the Avon Building and Loan Association mortgage. Both complainant and defendant tried the cause on the theory that the record and decree in the foreclosure suit was res adjudicata and conclusive upon the parties to the instant suit. In their arguments, oral and written, each claimed the earlier findings in O'Connor v. Arywitz, supra, to be conclusive upon the other. Such attitude and contention by both parties gives to those findings the quality of conclusiveness and estops both from questioning the finality of the determination therein. Clark Thread Co. v. William Clark Co., 55 N.J. Eq. 658,
approved on this point by court of errors and appeals, although reversed on other grounds, 56 N.J. Eq. 789. Aside from this, all the matters that were litigated in that foreclosure suit are, so far as they touched or involved O'Connor's covenant *Page 324 
of subordination and his duty to perform the same, resadjudicata in the present suit. By his bill of complaint in that suit O'Connor asserted priority in his mortgage over that of the Avon Building and Loan Association and sought to cut off its lien. To that bill the present complainant, Briscoe, was made a party defendant. The answer of the Building and Loan Association challenged the priority claimed for O'Connor's mortgage. Thus there was present in that suit, to which Briscoe was a party defendant, a clear issue concerning the relative priorities of the two mortgages, which issue could be resolved only upon a determination of the effect of the covenant of subordination contained in the mortgage made by Briscoe and held by O'Connor. "All that is necessary is that the right to relief in the one suit shall rest upon the same point or question which, in essence and substance, was litigated and determined in the first suit, and in such a case the parties and those in privity with them are concluded, `not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" In re Walsh, 80 N.J. Eq. 565; Mendel v. BerwynEstates, 109 N.J. Eq. 11.
The uncontradicted evidence before me is that in 1928 when the building was finished and O'Connor refused to subordinate, real estate commanded a ready market, and the mortgaged premises could have been sold at somewhere between $90,000 and $100,000 and this favorable condition continued throughout the year 1929; that in 1930 it would have brought between $85,000 and $90,000; that until 1931 the property was readily saleable and that since 1931 the real estate market has been so paralyzed that there were virtually no buyers for any real estate. It is significant that the defendant offered no evidence to contradict the figures furnished by complainant's two experts, both outstanding men in their craft. I am satisfied that during the years 1928 and 1929 and most of 1930 the property could have been sold for $85,000, had not the litigation provoked by O'Connor's refusal to subordinate been an insurmountable barrier to a sale. *Page 325 
When building operations were commenced and the Avon Building and Loan Association placed the $70,000 mortgage on the premises, O'Connor was requested to furnish a formal instrument of postponement. He declined to do so until the building was completed. When the building was completed he pronounced the structure "pretty nearly complete" pointing out minor deficiencies which could be met at a cost of approximately $30. While looking over the building O'Connor said, "well, the amount is there," and agreed to a figure of about $75,000 as representing the cost of the building which, added to $21,000, the undisputed cost of the land, produced a gross figure in relation to which O'Connor became obliged to postpone in favor of any mortgage not exceeding $72,000. The building and loan mortgage was for only $70,000. The following day he was again requested by letter to execute the instrument of postponement theretofore sent him. He did not reply, but the letter and the unexecuted postponement were delivered by O'Connor to his counsel. A few days before his mortgage became due his son, Thomas, wrote a letter demanding payment of it. In matters relating to his mortgage O'Connor was represented by his son, Thomas. Not only was he appointed to act for his father but whatever he did was subsequently ratified by the father.
On September 26th, 1928, when O'Connor's mortgage became due, the building and loan mortgage was already in default and on October 13th, 1928, it filed its bill to foreclose joining O'Connor as a party defendant, alleging, that because of the covenant of subordination in the latter's mortgage the lien thereof was junior to the lien of the building and loan mortgage. Apparently anxious to prosecute its suit to a decree and sale, the building and loan abandoned its suit and raised the issue of priority by answer and counter-claim in O'Connor's suit. The representative of the building and loan then suggested to O'Connor that the litigation over the priorities of the two mortgages be not permitted to hold up the sale of the property and that O'Connor consent that the property be sold pendentelite and the litigation as between the two mortgages conducted with respect to the proceeds *Page 326 
of sale. It was not possible to sell the property pendente lite
without such consent. O'Connor refused to give his consent.
Now O'Connor seeks to justify his refusal to subordinate in favor of $70,000 because Vice-Chancellor Backes in his decision compelled subordination in favor of only $64,500. From this circumstance O'Connor argues that he was justified in rejecting the larger subordination sought and that the consequent litigation and delays therefore cannot be laid at his door. This contention overlooks completely the fact that at one of the earlier hearings in 1929 and before the property had depreciated in value the building and loan association offered to take subordination in favor of $60,000 and that O'Connor refused to postpone in favor of any amount. From 1928 down and through the present litigation before me, notwithstanding the decision in the foreclosure suit, O'Connor steadfastly and stubbornly contended that he owed no subordination in any amount. O'Connor's counsel frankly stated that there never was a time when O'Connor would have yielded or furnished subordination in any amount or toany extent. That being so, it is of no moment that back in 1928 the building and loan association sought subordination for $70,000 when, as was ultimately established, it was entitled to subordination only for $64,500. It would not have mattered if at any time the association had asked for subordination in the sum of $64,500. O'Connor would have refused, just as he refused its offer to accept subordination in the lesser sum of $60,000 in 1929, at a time when the property could have been sold with advantage to all parties in interest. Moreover, O'Connor according to the evidence, desiring to avoid the status of a junior mortgagee, which status would flow from the performance of his agreement of subordination, contended in the earlier litigation that the covenant was vague and indefinite and therefore incapable of enforcement; that the covenant was personal and therefore not enforceable by or against privies, and that the covenant was not enforceable after the maturity of the mortgage in which it was contained. He evidently cherished the hope that ultimately he would compel the association to pay off his mortgage or, as an alternative, he would emerge from the *Page 327 
litigation the possessor of a first mortgage on a $90,000 property. By his various untenable positions and arbitrary refusals he made it utterly impossible for the building and loan association to reduce its mortgage lien to decree and sale at a time when a sale would have averted any deficiency. This barrier O'Connor effectually raised for such period as was required to exact from him that performance which he owed in 1928. In the interim the property so depreciated in value that the sale which was finally ordered did not bring enough to satisfy the amount due on the association's prior mortgage.
It is now argued in O'Connor's behalf that as a matter of law a mortgagee commits no wrong if he delays in the foreclosure of his security, and that if during the period of delay the security declines in value, the loss can in no way be charged against the mortgagee. No fault can be found with this principle. It is firmly embedded in our law. Freehold National Banking Co. v.Riley A. Brick, 37 N.J. Law 307; Prudential Insurance Company ofAmerica v. Rosenthal, 109 N.J. Eq. 386; Wilson v. Stevens,105 N.J. Eq. 377. The fallacy lies in counsel's attempt to apply the principle to the facts in the case at bar. All of the authorities submitted in his brief on the point deal with meredelay in the mortgagee's assertion of his rights. None deal with active interference by the mortgagee with the rights of a superior lien holder. Had O'Connor merely refrained from foreclosing his mortgage until 1933 and thrown no obtsacle in the way of the foreclosure of the building and loan association's prior mortgage, his conduct would be altogether unimpeachable. What he did, however, was to become the actor in a proceeding which had for its palpable purpose the avoidance of his solemn covenant and the defeat of the superior lien of the association's mortgage, and this by means that were wholly without support in law. The inescapable consequence of his effort was to prevent a sale of the property until such time when the property had greatly shrunk in value. Except for his efforts and the intervening shrinkage, there would not be present to-day the deficiency which he seeks to saddle upon the complainant. If O'Connor were entirely an innocent *Page 328 
party, it would yet follow that as between himself and Briscoe, also innocent, the loss must equitably be placed upon the shoulders of him who created the situation. But O'Connor can hardly be regarded, in view of his willful breach, as an innocent party. His conduct in support of a breach of his covenant and in obstruction of the rights of others can hardly be palliated by the argument that O'Connor had a right to litigate his fanciful defenses. The right to litigate is not absolute. It has its qualifications, one of which is good faith.
O'Connor's counsel further contends that Briscoe, being the obligor, should have terminated the litigation before the real estate declined by paying the mortgage. The answer to that contention is that Briscoe's contract as the maker of the bond must be read in the light of 3 Comp. Stat. p. 3421 § 48 of our Mortgage act. That act was passed to ameliorate some evils which theretofore could be visited upon the mortgagor-obligor. As was said by Mr. Justice Kalisch, speaking for the court of errors and appeals in Knight v. Cape May Sand Co., 83 N.J. Law 597
(at p. 601): "Its palpable object is to prevent an obligee of a bond from suing thereon, until he shall have first foreclosed the mortgage, which has been given as collateral security for the payment of the bond." Since 1881 it has been altogether settled that mortgaged premises constitute the primary fund out of which the debt must first be satisfied and that the maker of a bond is answerable only for so much of the debt as remains unsatisfied by the proceeds of the foreclosure sale. The obligor's liability is by the practical effect of our statute limited to the net loss
and that is not determinable until after the foreclosure sale is held. There was no duty resting upon Briscoe to surrender the immunity and protection furnished him by our statute.
I am now brought to the only other matter in the case that requires mention, and that is complainant's participation in the foreclosure suit in aid of O'Connor.
It is not disputed that starting in July of 1929 Briscoe assisted O'Connor in the latter's effort to show that the building cost less to construct than what was claimed by the Avon Building and Loan Association. Briscoe, a building contractor, *Page 329 
was of opinion that the building cost, without the land, about $60,000. He was, according to the evidence, unwilling to engage generally in the dispute between O'Connor and the building and loan, but was willing to furnish expert testimony as to the cost of the building. This appears from a letter written by Mr. John J. McCloskey, Briscoe's lawyer, to O'Connor's attorneys, on July 19th, 1929. The admissibility of this letter has been challenged. Quite apart from the letter, the oral testimony before me establishes that the many attacks on the covenant were conceived by O'Connor's attorneys almost a year before McCloskey entered the picture and that the only evidence that McCloskey offered at any time related to the cost of the building, and this by an understanding with Mr. Davis (O'Connor's attorney) that McCloskey's witnesses would prove that the building should not have cost over $60,000. It will be seen that if McCloskey established the cost of the building at $60,000, this, added to the $21,000 cost of the land, would make a total of $81,000 and would entitle the building and loan association to $60,000 subordination, which it was willing to take. At that time the property could have been sold at a price which, after yielding to the building and loan the first $60,000, would have left enough to satisfy O'Connor's mortgage and would have relieved Briscoe from all risk of deficiency. To achieve this result Briscoe was willing to supply the testimony of building experts. O'Connor accepted his assistance not to reduce the amount of subordination, but to defeat all subordination, because it was his fixed notion that if the cost of the building were only $60,000 the building and loan would be entitled to no subordination and he, O'Connor, would enjoy the comfortable position of a first mortgagee with an absolute assurance of payment. It was made very clear in the case that Briscoe's participation in no way influenced the litigation. O'Connor's attorney testified that even if McCloskey had not entered the controversy O'Connor would not have abandoned his position or his contentions and that the litigation which took several years was not carried on because of McCloskey's presence in the case. The evidence clearly establishes that Briscoe's assistance *Page 330 
through McCloskey and several expert witnesses was no factor in O'Connor's determination to carry on the contest with the building and loan to a final decision. I find nothing in Briscoe's conduct to provoke any estoppel against him.
Other contentions advanced by defendant O'Connor in the briefs of his counsel have been considered, and I find them without merit.
The case of Innes v. Stewart, 36 Mich. 285, is decidedly in point. There the court of chancery of Michigan restrained a suit on a bond to recover a deficiency after a foreclosure sale. Complainant claimed that persons who would otherwise have bid for the mortgaged premises were induced not to do so by secret arrangements made with them. It was there held that "* * * the interference to prevent a fair and usual sale to the highest bidder is enough of itself to estop the parties from claiming a deficiency which they have been the means of creating." On appeal the supreme court held that the deficiency suit was not a "fair" one and "is meant to enforce a liability which the parties are estopped from asserting." See, also, Atlantic Shores Corp. v.Zetterlund (Supreme Court of Florida), 138 So. Rep. 50; Inthe Matter of Collins, 17 Hun. 289. I see no distinction in logic or principle between the defendant's conduct in the case ofInnes v. Stewart, supra, where the mortgagee caused bids to be withheld when the property was available at sale and the instant case where the mortgagee caused the property to be withheld from sale when bidders were available. In each case the vicious result was the same, enough was not realized to pay the mortgage debt. While the Atlantic Shores Case and the CollinsCase, above cited, are distinguishable in the matter of procedure, the underlying principle is the same, namely, that a deficiency recovery will not be permitted when the suitor therefor has been responsible by his conduct in creating the deficiency. The doctrine of equitable estoppel obtains where there is injury to one party or advantage to the other, resulting from the acts or declarations of the person to be estopped. 21Corp. Jur. 1135; 2 Story Eq. Jur. 566 § 1206.
Decree will be advised enjoining suit at law upon the bond for deficiency. *Page 331